**Conrad PETER, Appellant in No. 88–3797,**

v.

**HESS OIL VIRGIN ISLANDS CORP., Appellant in No. 88–3798.**

**Nos. 88–3797, 88–3798.**

United States Court of Appeals, Third Circuit.

Argued Sept. 26, 1989.

Decided May 17, 1990.

Rehearing Denied Aug. 17, 1990.*

Rehearing En Banc Denied Aug. 17, 1990.

Joel H. Holt (argued), Christiansted, St. Croix, U.S. Virgin Islands, Paul S. Minor, Minor & Benton, Biloxi, Miss., for Conrad Peter.

Britain H. Bryant, Stacy L. White, Britain H. Bryant & Associates, P.C., Christiansted, St. Croix, U.S. Virgin Islands, Jeffrey K. Sherwood (argued), C. Fairley Spillman, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Hess Oil Virgin Islands Corp.

Before HIGGINBOTHAM, STAPLETON, and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

### I.

This is a negligence action brought by Conrad Peter against Hess Oil Virgin Islands Corporation ("Hess") under Virgin Islands law. Peter alleged that Hess did not take the safety measures necessary to protect him from exposure to jet fuel while working with fuel hoses at Hess' St. Croix refinery in 1984 and 1985, and that as a

result of this exposure he suffered permanent lung injuries. A jury agreed and assessed his damages at $1.5 million. His recovery was reduced by $300,000, however, because of contributory negligence. These cross-appeals ensued. Jurisdiction below was based on 48 U.S.C. § 1612 and 4 V.I.C. § 32. We have jurisdiction over appeals from final decisions of the District Court of the Virgin Islands pursuant to 28 U.S.C. § 1291 and § 1294(3).

Several issues are presented on appeal. However, we address ourselves solely to Hess' contention that the judgment below must be reversed because allowing Peter a tort recovery against Hess under Virgin Islands law conflicts with the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.* Because we find that the common law negligence action Peter is pursuing obstructs the congressional policies advanced by LHWCA, we reverse.

## II.

Hess argues that the Virgin Islands may not afford Peter a negligence action against Hess, his "borrowing employer", since § 905(a) of LHWCA purports to make the remedies available under LHWCA the exclusive source of relief for an injured longshoreman against his employer.[1] Our review of this question of law is plenary. This argument depends heavily on the answers to certain predicate questions. First, where was Peter working when he was exposed to jet fuel? Second, do his injuries fall within the scope of LHWCA? Third, does LHWCA recognize the borrowed servant doctrine? Fourth, was Peter Hess' borrowed servant? We address these questions *seriatim.*

### A.

At Hess, Peter tied ships up to the dock, swept the dock, ran errands, and performed other maintenance chores. He also performed two tasks which required him to work with fuel hoses. The jury found that Peter suffered permanent lung injuries as a result of exposure to kerosene-based jet fuel while working with fuel hoses at Hess' refinery. These hoses were used to pump fuel aboard ships docked at Hess' refinery, and were permanently connected at one end to equipment based on Hess' pier. During this work Peter was not equipped with a face shield or other respiratory protection.

One of Peter's jobs was to connect and disconnect these hoses to ships. He would stand on the deck of the ship and a hose would be lowered to him by a crane on the dock. To attach the hose to the ship, Peter removed the bolts from flanges which sealed the line and then secured the hose to the ship's manifold. Before the unsealed hose could be connected to the ship Peter was often sprayed with jet fuel, causing him to inhale fumes from and ingest the jet fuel.

Hess does not dispute there is evidence that Peter was exposed to jet fuel while connecting hoses to ships docked at Hess. What it disputes is whether Peter was also so exposed while performing a second task, the "hose around", on the adjacent dock. This procedure involved connecting two fuel lines to ensure they were clean before use in loading or unloading fuel from a ship. The hoses were lifted by a crane down to the dock where Peter would remove flanges from the lines so they could be connected and flushed out. Peter's coworker Morton indicated that Peter was splashed and sprayed with jet fuel during the hose around because of releases occurring when gaskets blew, bolts were removed, line blockages gave way, or the crane operator tilted the hoses at too great

---

1. For purposes of our analysis, the Virgin Islands stands in no different position than would a state. The legislature of the Virgin Islands may not enact legislation inconsistent with the laws of the United States made applicable to the Virgin Islands. 48 U.S.C. § 1574(a). Therefore, only recently we have held that a Virgin Islands attorneys' fees statute could not be applied in a case cognizable in admiralty, because of its inconsistency with admiralty law principles. *Sosebee v. Rath,* 893 F.2d 54 (3d Cir.1989). LHWCA applies to the Virgin Islands because the Act includes within the definition of navigable waters of the United States those of United States territories. 33 U.S.C. § 902(8).

an angle. Morton testified that Peter actually swallowed fuel during this process.

The district court, in the course of ruling on a motion to dismiss filed before and determined after trial, indicated that Peter's "most substantial exposure to the offending fuel was when he was on land on the dock engaged in disconnecting hoses" and thus "to a large extent his injuries were land-based." App. at 219. The trial record does not support this conclusion, since we find no rational basis in the record to determine which activity resulted in greater exposure. However, we do find evidence which supports a finding that Peter suffered substantial exposure to jet fuel both during the hose around and while working with fuel hoses aboard ships.[2]

### B.

We answer the second question by agreeing with Hess that Peter's injuries fall within the scope of LHWCA, a federal workmen's compensation statute which provides compensation to certain employees for:

> disability or death ... if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading or unloading, repairing, or building a vessel)....

33 U.S.C. § 903. Under LHWCA, an employee "means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations...." 33 U.S.C. § 902(3). To be covered by LHWCA an employee must have been injured on a "situs" included in § 903's definition of navigable waters and a satisfy a "status" test. *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 416, 105 S.Ct. 1421, 1423, 84 L.Ed.2d 406 (1985).[3] Since Peter was exposed to jet fuel on a ship and on a pier adjacent to the navigable waters, he satisfies the situs requirement.[4] As both the hose around and connecting of fuel hoses were tasks necessary to the loading of vessels, Peter also satisfies the "status" requirement. *Chesapeake and Ohio Railway Co. v. Schwalb*, — U.S. ——, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989); *P.C. Pfeiffer v. Ford*, 444 U.S. 69, 80, 100 S.Ct. 328, 336, 62 L.Ed.2d 225 (1979); *Northeast Marine Terminal Co. Inc. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

### C.

The third and fourth questions we have posed require us to determine: (a) whether LHWCA is properly construed in accordance with the borrowed servant doctrine, and, if so, (b) whether Peter was Hess' borrowed employee at the time he worked at its refinery. If the answer to these questions is yes, this has important consequences for our analysis since LHWCA has contained, from its inception, a provision specifying that LHWCA benefits are the exclusive remedy against an employer who is responsible for them:

> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such

---

2. Hess makes much of Peter's medical expert's testimony that Peter's injuries were caused by his exposure to jet fuel while connecting and disconnecting hoses to and from ships. Since the medical expert did not testify that Peter's injuries were caused by exposures during the "hose around", Peter's injuries supposedly were all caused on ships. This argument is unpersuasive. The expert was testifying about the medical causes of Peter's condition. He identified the cause as exposure to jet fuel. This is the import of the testimony. That the doctor said that Peter's injuries were caused by exposure to jet fuel while connecting hoses to ships does not eradicate the effect of Morton's testimony that Peter swallowed jet fuel during the hose around.

We decline to read the doctor's testimony as indicating that jet fuel swallowed on the deck of a ship is somehow more harmful than identical jet fuel swallowed on a dock.

3. The employee must also be employed by an "employer" defined as "an employer any of whose employees are employed, in whole or in part, upon the navigable waters of the United States" as defined by 33 U.S.C. § 903. 33 U.S.C. § 902(4).

4. LHWCA-covered injuries include occupational disease arising from maritime employment. 33 U.S.C. § 902(2).

employer to the employee ... except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee ... may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death....

33 U.S.C. § 905(a).[5] Hess contends that as Peter's borrowing employer, it is entitled to the immunity afforded by this provision, an immunity it believes bars the tort action Peter is pursuing against it.

The borrowed servant doctrine has commonly been applied in the context of workmen's compensation statutes to hold borrowing employers liable for compensation for injuries suffered by their borrowed employees. *See generally* 1C A. Larson, Workmen's Compensation Law § 48 (1989) ("Larson") (discussing doctrine and citing cases). Concomitantly, it has been applied to afford the borrowing employer with the immunity provided by workmen's compensation statutes that, as a general rule, make their statutory benefits the exclusive remedy against the employer of the injured party. *Id.* We have recently described this use of the doctrine:

> Under the borrowed employee doctrine, if a special (borrowing) employer exercises a sufficient degree of control over a borrowed employee for a time sufficient to suggest that the employee has assessed the risks of his new employment and has acquiesced in his borrowing employer's control, the borrowing employer may be deemed a statutory employer for purposes of workers' compensation. *See generally* 1C A. Larson, *Workmen's Compensation Law* § 48.10 (1982). The borrowed employee is then barred from suing his borrowing employer for injuries sustained during the course of his employment; instead, the borrowed employee is remitted to the exclusive remedy provided by the relevant workers' compensation act.

*Vanterpool v. Hess Oil V.I. Corp.*, 766 F.2d 117, 121 (3d Cir.1985).

In *Vanterpool*, we found the borrowed servant doctrine applied within the statutory scheme of the Virgin Islands Workmen's Compensation Act, 24 V.I.C. § 251 *et seq.*, as it existed at the time plaintiff Vanterpool was injured. Therefore, we held that the doctrine barred Vanterpool, an employee loaned from Litwin to Hess, from maintaining a tort action against Hess under Virgin Islands law to recover damages for an injury suffered at its refinery.

On October 19, 1984, a month before Peter came to work at Hess' refinery, the legislature amended the Islands' compensation act to add a section abrogating the borrowed employee doctrine:

> It shall not be a defense to any action brought by or on behalf of an employee, that the employee at the time of his injury or death was the borrowed, loaned or rented employee of another employer. Any oral or written agreement between an employer and employee which makes the employee the borrowed, loaned or rented employee of another employer shall be null and void as being against the public policy of this Territory.

24 V.I.C. § 263a; *see also* 24 V.I.C. § 284(b). Since the Virgin Islands legislature has no legislative authority with respect to federal law, this statute abrogated the borrowed servant doctrine for purposes of the Virgin Islands workmen's compensation statute but had no effect upon LHWCA.

Although this court has never faced the question of whether the borrowed servant doctrine is properly applied to LHWCA, two sister courts of appeals have held that that doctrine is a valid way to determine whether a particular business entity is liable for a worker's LHWCA compensation and therefore eligible for protection under § 905(a). The Fifth Circuit first applied the borrowed servant doctrine for purposes of determining whether the defendant was

---

**5.** Prior to 1972, this provision was codified as 33 U.S.C. § 905. When we speak of § 905 or 905(a) we are referring to the substance of what is set forth above. Also, when we refer to § 905 or 905(a) of LHWCA, we are referring to § 5 or 5(a) of the Act as codified at 33 U.S.C. 905, 905(a).

shielded by the exclusivity provision of § 905(a) of LHWCA in *Ruiz v. Shell Oil Company*, 413 F.2d 310 (5th Cir.1969). In *Huff v. Marine Testing Corp.*, 631 F.2d 1140 (4th Cir.1980) the Fourth Circuit also applied the doctrine to LHWCA.

The Benefits Review Board, the adjudicative agency for claims arising under the Act, has also applied the borrowed servant doctrine in determining who is an employer under the Act. *Edwards v. Williamette Western Corporation*, 13 BRBS 800 (1981) (approving use of the Fifth Circuit and Larson tests of borrowed employee status for use under LHWCA and indicating there can be two employers jointly liable for LHWCA compensation); *see also Symanowicz v. Army & Airforce Exchange Service*, 672 F.2d 638 (7th Cir.) (reviewing and affirming a Benefits Review Board case where the Board applied the borrowed servant test to determine whether claimant was employed by an entity he claimed was responsible for securing his benefits), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982).

■ We agree with the Fourth and Fifth Circuits and with the Benefits Review Board that the concept of an employer as used in LHWCA includes firms considered borrowing employers under the borrowed servant doctrine. Workmen's compensation statutes have commonly been construed to make borrowing employers liable for the compensation of their borrowed servants, and thus borrowing employers have been considered "employers" for purposes of immunity from tort liability. See 1C Larson, *supra*, § 48. LHWCA follows the traditional pattern of workmen's compensation statutes, and we are confident that LHWCA was intended by Congress to be construed in accordance with the borrowed servant doctrine. Thus, we believe that if Peter is Hess' borrowed employee, he is Hess' employee for purposes of LHWCA.

In reaching this conclusion we have not overlooked the 1984 amendments of LHWCA, which Peter contends foreclose application of the borrowed servant doctrine. Congress passed these amendments in response to the case of *Washington*

*Metropolitan Transit Authority v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984). In *Washington Metro*, the Supreme Court held that a contractor who purchased LHWCA coverage for the employees of its subcontractors could be considered the "employer" of those employees for purposes of the exclusivity provision of § 905(a) of LHWCA, despite the fact that the contractor had not been statutorily required to procure this coverage. The contractor was not a borrowing employer and no borrowed servant doctrine issue was raised.

Congress moved swiftly to statutorily overrule *Washington Metro*. Section § 904(a) was amended to provide that a "subcontractor shall not be deemed to have failed to secure the payment of compensation if the contractor has provided insurance for such compensation for the benefit of the subcontractor." 33 U.S.C. § 904(a). Section 905(a) was amended to make clear that a "contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section [904]." 33 U.S.C. § 905(a).

In *West v. Kerr–McGee Corp.*, 765 F.2d 526 (5th Cir.1985), the Court of Appeals for the Fifth Circuit held that the 1984 post-*Washington Metro* amendments did not preclude use of the borrowed employer doctrine under LHWCA. The court acknowledged that the "bare language of the amendment to § 905(a) could ... be interpreted as foreclosing any designation of any contractor as the employer of its subcontractors' employees—even if a borrowed employee relationship existed—unless the subcontractor failed to secure compensation payments." 765 F.2d at 529. However, it noted that another possible reading was "that the 'shall be deemed' language of the § 905(a) amendment refers only to 'deeming' a contractor the employer of a subcontractor's employee when the contractor is not the employee's true employer as well," that is, when the employer was not the employee's borrowing employer. *Id.* at 530.

Since these contrary readings evidenced "latent ambiguities" in the statute, the court looked to the legislative history of the 1984 amendment. Finding that the only purpose of Congress was to overrule *Washington Metro,* and that there was no intent to overturn the borrowed servant cases decided under LHWCA, the *West* court held that the borrowed servant immunity defense was still available under LHWCA. *Id.* at 530. The Fifth Circuit has continued to adhere to *West. See, e.g., Melancon v. Amoco Production Co.,* 834 F.2d 1238 (5th Cir.1988); *Alexander v. Chevron, U.S.A.,* 806 F.2d 526 (5th Cir. 1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Capps v. N.L. Baroid–NL Industries, Inc.,* 784 F.2d 615 (5th Cir.1986), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986); *Doucet v. Gulf Oil Corp.,* 783 F.2d 518 (5th Cir. 1986), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *see also* 1A E. Jhirad, *Benedict on Admiralty,* § 34, 2–73 (1989) (suggesting that the borrowed servant doctrine is still viable under LHWCA).

*West*'s reading of the legislative history is correct; there is nothing in the legislative history indicating that Congress intended to do anything other than overrule *Washington Metro.* H.R.Conf.Rep. No. 98–1027, 98th Cong., 2d Sess. 24, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2734, 2774. That brief history does not support the proposition that Congress wished to upset the use of the borrowed servant doctrine as utilized by the Fourth and Fifth Circuit cases; this is an omission of some significance in light of the care taken in the legislative history to identify cases that Congress did intend to overturn. H.R.Rep. No. 98–570, 98th Cong., 2d Sess. 7, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2740 (indicating rejection of

*McDermott v. Boudreaux,* 679 F.2d 452 (5th Cir.1982)); 130 Cong.Rec. H2488 (daily ed. April 9, 1984) (Explanation of House Amendment to S. 38, The Longshoremen's and Harbor Workers Act Amendments of 1983) (indicating intent to overrule *Melson v. United Brands Corporation,* 594 F.2d 1068 (5th Cir.1979)).

It is the language of the amendments that provides the strongest support for the argument that the borrowed servant doctrine is no longer viable under LHWCA. However, while this language clearly denies immunity to contractors except in circumstances where the contractor has been forced to fulfill its role as a back-up provider of compensation for the subcontractor's employees, it does not provide a viable alternative to, nor does it clearly render inappropriate, use of the borrowed servant test to address a central question under the Act: who is the claimant's employer for purposes of the Act? [6] The borrowed servant test provides a way to answer the question that accords with the reality of the claimant's employment circumstances; a way that we believe the Congress would not have eliminated without indicating what should take its place. When this test indicates that an entity other than the one that putatively employs the claimant is really the claimant's employer, that borrowing employer has been found to be the claimant's employer under the Act and has been held to be both subject to the burdens and entitled to the benefits that come with such status. We find that this continues to be the appropriate approach under LHWCA. Hence, if Hess is Peter's borrowing employer, then it is entitled to whatever immunity is available under § 905(a) of the Act.

■ The district court made no determination of whether Peter was Hess' bor-

---

**6.** Thus, Professor Larson indicates that "[t]heoretically, the process of determining whether the [borrowing] employer is liable for compensation consists simply of applying the basic tests of employment...." 1C A. Larson, Workmen's Compensation Law § 48.13 at 8–414 (1989); *see Oilfield Safety and Machine Specialties Inc. v. Harman,* 625 F.2d 1248, 1253–57 (5th Cir.1980) (noting similarity between Fifth Circuit borrowed servant test and the common-law test

used under LHWCA). On the other hand, secondary liability for contractors under workers' compensation laws turns not on the employee's consent to work for the borrower, but on the relationship between the borrower and the employee's subcontractor-employer, and is designed to give contractors an incentive to use insured subcontractors. 2A Larson, *supra,* § 72.31(c), (b).

rowed servant since it concluded that Peter could recover in tort against Hess under Virgin Islands law regardless of whether Hess was Peter's employer under LHWCA. However, the trial record before us on this issue is substantial, and we believe that no reasonable trier of fact could conclude from that record that Peter was not Hess' borrowed servant. The Fifth Circuit, starting with *Ruiz*, has focused on nine relevant factors to determine whether a worker is a borrowed employee.[7] But in *Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978), the court considered only two of these factors to be essential in the workmen's compensation context: (1) whether the borrowing employer was responsible for the borrowing employee's working conditions and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his new employment. 562 F.2d at 357. In *Vanterpool* we placed heavy emphasis on these factors as well, and indicated that the borrowed servant doctrine is "neither unfair nor unreasonable [as a bar to tort recovery] when it is remembered that compensation liability cannot exist in the absence of some express or implied contract of hire between the borrowed employee and the borrowing employer." 766 F.2d at 122.

In this case, Peter explicitly agreed to work under conditions controlled solely by Hess. While Peter was directly employed by the Litwin Panamerican Corporation ("Litwin"), Litwin and Hess had a contractual arrangement whereby Litwin agreed to provide personnel for general maintenance and turnaround work at Hess' refinery. Defendant's Exhibit Y, App. 1077–

1095.[8] This agreement divided loaned employees into two categories. The Type I category was comprised of employees who were furnished to work under Hess' exclusive direction and control and for whose workmanship Litwin was not responsible to Hess. App. at 1077. Type II loanees, by contrast, were to be supervised and directed by Litwin. *Id.* Litwin was contractually bound to pay the salaries of and procure workmen's compensation insurance for the Type I and II loanees. App. at 1084–85.

Peter came to work as a Type I loanee at Hess' St. Croix refinery on November 19, 1984. At that time he executed a Litwin document acknowledging that he was aware: (1) his work would be controlled, directed and supervised by Hess; (2) he should not receive direction from anyone except Hess or a Hess loanee supervisor; and (3) that Hess would provide him with safety equipment and a safe working environment. App. at 1076. Peter worked at the Hess refinery until August 22, 1985, under conditions of control consistent with this contractual arrangement, and was injured while performing the work of Hess. He clearly acquiesced in working for Hess and Hess, via Litwin, was the provider of his salary and LHWCA coverage.[9]

We find no evidence in the record that could reasonably lead us to deviate from the opinions we expressed in *Vanterpool* that: "any assigned Type–I employee would necessarily work under the direct supervision and control of [Hess]," that Litwin acts essentially as an employment broker with respect to Type I employees, and that "it is difficult to conceive how a Type I employee, who obtained employment through Litwin could be deemed to do

---

7. These factors are: (1) Who has control over the employee and his work? (2) Whose work is being performed? (3) Was there an agreement between the original and borrowing employer? (4) Did the employee acquiesce in the new work situation? (5) Did the original employer terminate his relationship with the employee? (6) Who furnished the tools and place for performance? (7) Was the new employment over a considerable length of time? (8) Who has the right to discharge the employee? (9) Who had the obligation to pay the employee? *West v. Kerr–McGee Corp.*, 765 F.2d at 530.

8. For a full discussion of this agreement, see this court's opinion in *Vanterpool v. Hess Oil*, 766 F.2d 117 (3d Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986).

9. Indeed, Peter's negligence theory is based on Hess' alleged breach of its duty to provide him with safe work conditions and adequate safety equipment.

anything other than consent to work for [Hess]." *Id.* at 120, 127; *see also Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237 (3d Cir.1987) (following *Vanterpool* and holding summary judgment appropriately granted to Hess on defense that Type I loanees were borrowed servants). We therefore find that Hess is Peter's employer for purposes of LHWCA.

### III.

Having determined this, a literal reading of § 905(a) would indicate that this is a simple case and Peter is entitled only to the remedies available under LHWCA. We are not free, however, to give the usual weight to the statutory text here. LHWCA is a statute which can be understood only in light of its considerable history, and, as we shall see in the ensuing review of that history, this section of LHWCA has not been construed to bar all state remedies against the employer.

### A.

■ To resolve this case we must consider a line of Supreme Court admiralty and LHWCA cases beginning with *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). *Jensen* held that the State of New York could not constitutionally provide a workmen's compensation remedy to the survivors of a worker killed on the gangway between a ship and shore while unloading lumber from the ship. As the decedent was working as a stevedore over navigable waters at the time he was killed, the Court indicated his claim fell "clearly within the admiralty jurisdiction." *Id.* at 217, 37 S.Ct. at 529. The Court stated that there are limits to the extent a state could affect the general maritime law, and that state law violates Articles III, § 2[10] and I, § 8[11] of the Con-

stitution "if it contravenes the essential purpose expressed by an act of Congress or works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." *Id.* at 216, 37 S.Ct. at 529.

The Court held that the New York statute undermined the uniformity of the maritime law, reasoning that if New York were permitted to apply its law, then every other state would be permitted to impose similar obligations on maritime employers within their jurisdictions, subjecting them to a myriad of burdensome regulations. *Id.* at 217–18, 37 S.Ct. at 529–30. Moreover, the award could not be sustained as a common law remedy saved to the longshoreman by the savings to suitors clause, then 28 U.S.C. § 1333(a)(1),[12] because the no-fault administrative remedy provided by New York's compensation statute was unknown at common law and no court was competent to award such relief. *Id.* at 218, 37 S.Ct. at 530.

After *Jensen*, however, the Supreme Court made clear that its concern for the uniformity of the maritime law abruptly ended at the water's edge. Because of the Supreme Court's reliance on the locality of the tort as determining, in the first instance, whether a state could apply its workmen's compensation scheme to an injury suffered by a longshoreman, it never inquired into the impact upon maritime commerce or the uniformity of the maritime law caused by state statutes requiring employers of workers who regularly traversed the shore line to obtain insurance under the state statute.

For example, in *Industrial Comm. v. Nordenholt Co.*, 259 U.S. 263, 42 S.Ct. 473,

---

**10.** Article III, § 2 of the Constitution extends the federal power to "all Cases of admiralty and maritime Jurisdiction."

**11.** Article I, § 8 gives Congress the power "[t]o make all laws which may be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States or in any department or officer thereof."

**12.** This provision then provided that the district courts of the United States had original jurisdiction of admiralty cases to the exclusion of the state courts, saving to suitors "the right of a common law remedy where the common law is competent to give it." This section, now 28 U.S.C. § 1333(1), now saves to suitors "all other remedies to which they are otherwise entitled."

66 L.Ed. 933 (1922), a longshoreman had been killed on a dock while unloading a vessel lying in navigable waters. The state courts reversed a state compensation award to the decedent's survivors, relying on *Jensen*. The Supreme Court held that *Jensen* did not preclude the state award:

When an employee, working on board a vessel in navigable waters, sustains personal injuries there, and seeks damages from the employer, the applicable legal principles are very different from those which would control if he had been injured on land while unloading the vessel. In the former situation the liability of the employer must be determined under the maritime law; in the latter, no general maritime law prescribes the liability, and the local law has always been applied. The liability of the employer for damages on account of injuries received on shipboard by an employee under a maritime contract is matter within the admiralty jurisdiction; but not so when the accident occurs on land.

*Id.* at 271–72, 42 S.Ct. at 473–74. Thus, no matter how directly related a longshoreman's tasks were to maritime commerce, and no matter how burdensome the state insurance scheme was to his employer, a state could require that maritime employer to pay a compensation award for an injury suffered on land. *Nordenholt* and a consistent line of subsequent cases establish that the *Jensen* doctrine would not foreclose the Virgin Islands from providing a workman's compensation remedy for the injury Peter suffered while performing the hose around task on the dock.

It was in the case of injuries occurring over the navigable waters that the court undertook an inquiry into the burden a state compensation statute would have on the uniformity of the maritime law and maritime commerce. Not every worker injured on the navigable waters was precluded from a state workmen's compensation recovery. Instead, "[i]f the employment of an injured worker was determined to have no 'direct relation' to the navigation or commerce, and 'the application of local law [would] not materially affect' the uniformity of maritime law, then the employment

would be characterized as 'maritime but local,' and the State could provide a compensation remedy." *Director, OWCP v. Perini North River Assoc.*, 459 U.S. 297, 306, 103 S.Ct. 634, 641, 74 L.Ed.2d 465 (1983) (quoting *Grant Smith–Porter Ship Co. v. Rohde*, 257 U.S. 469, 477, 42 S.Ct. 157, 158, 66 L.Ed. 321 (1922)).

The "maritime but local" exception to *Jensen* became infamous several years after Congress enacted LHWCA in 1927. As enacted, LHWCA was a "gap-filler", *Caputo*, 432 U.S. at 257, 97 S.Ct. at 2353, providing compensation to workers, excluding certain employees such as the crews of vessels, for injuries occurring upon the traditional navigable waters of the United States only "if recovery . . . through workmen's compensation proceedings may not be validly provided by State law." 44 Stat. (part 2) 1424 at 1426, *quoted in Perini*, 459 U.S. at 307, 103 S.Ct. at 642. This language was initially interpreted as excluding from LHWCA coverage employees falling within the "maritime but local" exception. G. Gilmore & B. Black, The Law of Admiralty 419–420 (2d ed.1975).

This interpretation led to a great deal of uncertainty among the courts and injured longshoremen as to the proper forum to file compensation claims based on injuries suffered over the water. As a result of this confusion, many injured longshoremen were effectively denied recovery, since if a worker chose a state compensation remedy and was found not to fall within the "maritime but local" exception he was often left without a remedy because he would be time-barred under LHWCA. Similarly, if a worker claimed under LHWCA and was found to fall within the "maritime but local" exception, he had no LHWCA remedy and might be time-barred at state law. This game was particularly treacherous for injured longshoremen because judicial determinations as to what was "maritime but local" were often fundamentally inconsistent with one another. *See Calbeck v. Travelers Insurance Co.*, 370 U.S. 114, 119, 82 S.Ct. 1196, 1199, 8 L.Ed.2d 368 (1962) ("No dependable definition of the area—described as 'maritime but local', or

'of local concern'—where state laws could apply ever emerged from the many cases which dealt with the matter in this and the lower courts. The surest that could be said was that any particular injury might be within the area of 'local concern,' depending upon its peculiar facts.").

The Supreme Court recognized the unfairness inherent in this state of affairs in *Davis v. Department of Labor*, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942). The court in *Davis* sustained a state compensation award to the widow of a steel worker. The steel worker had drowned in navigable waters after falling off a barge while helping to load the barge with pieces of steel from a drawbridge that was being dismantled. The Washington statute at issue allowed compensation for employees if it could be made within the permissible limits of the state's jurisdiction; the Washington Supreme Court had held that an award to the steel worker was constitutionally impermissible.

The Supreme Court reversed, not because the employment was of the maritime but local variety, but because of a new concept it articulated, the "twilight zone." The Court acknowledged that the uncertainty engendered by the maritime but local doctrine "defeat[ed] the purpose of the federal act, which seeks to give to these hard-working men, engaged in a somewhat hazardous employment, the justice involved in the modern principle of compensation, and the state Acts such as the one before us, which aims at sure and certain relief for workmen." *Id.* at 254, 63 S.Ct. at 228 (quotations omitted).

Realizing that courts had often divided on questions of line-drawing in this area and that the case law was incoherent, the Court indicated that it would effectively abandon any pretense of categorizing workers whose injuries could not be easily identified as either compensable or not compensable by state law under the maritime but local doctrine. These injured employees occupied "that shadowy area within which, at some undefined and undefinable point, state laws can validly provide compensation." *Id.* at 253, 63 S.Ct. at 227.

In this twilight zone of uncertainty, it was impossible for employees or employers to determine in advance whether sanctioning the state remedy in the particular situation involved would sufficiently "interfere with the proper harmony and uniformity of maritime law" as to be unconstitutional. *Id.* at 254, 63 S.Ct. at 228. The Court then looked to commerce clause jurisprudence for a resolution to this dilemma:

> We find here a state statute which purports to cover these persons, and which indeed does cover them if the doubtful and difficult factual questions to which we have referred are decided on the side of the constitutional power of the state. The problem here is comparable to that in another field of constitutional law in which courts are called upon to determine whether particular state acts unduly burden interstate commerce. In making the factual judgment there, we have relied heavily on the presumption of constitutionality in favor of the state statute.

*Id.* at 257, 63 S.Ct. at 229. Giving "full weight" to this presumption of constitutionality and resolving all doubts in favor of that presumption, the Court indicated that a finding of unconstitutionality could not be "rested on so hazardous a factual foundation" and reversed the judgment of the Oregon Supreme Court denying state compensation relief to the steel worker's widow. *Id.* at 258, 63 S.Ct. at 230. As the Court noted many years later, by so holding the *Davis* court "effectively established a regime of concurrent jurisdiction" within the twilight zone. *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 718, 100 S.Ct. 2432, 2435, 65 L.Ed.2d 458 (1980).

In *Calbeck v. Travelers Ins. Co.*, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962), the Supreme Court further reduced the chances that an injured worker would fall between the cracks of the shifting jurisdictional line created by the maritime but local doctrine. *Calbeck* held that LHWCA, as it then stood,

> emerge[d] from ... a congressional desire for a statute which would provide federal compensation for all injuries to employees on navigable waters; in every

case, that is, where *Jensen* might have seemed to preclude state compensation. The statute's framers adopted this scheme in the Act because they meant to assure the existence of a *compensation remedy* for every such injury, without leaving employees at the mercy of the uncertainty, expense, and delay of fighting out in litigation whether their particular cases fell within or without state acts under the "local concern" doctrine. *Id.* at 120–22, 82 S.Ct. at 1200–01 (emphasis added). Finding this to be Congress' overriding purpose, the Court construed § 903(a) of LHWCA, which then provided for compensation under LHWCA only for injuries occurring on the navigable waters "and if recovery ... through workmen's compensation proceedings may not validly be provided by State law," to mean that such compensation was available in any situation where the maritime but local cases "had rendered questionable the availability of a state compensation remedy." *Id.* at 126, 82 S.Ct. at 1203. Thus, there were circumstances in which, contrary to what the text of section 903(a) might have indicated, a worker could obtain a LHWCA award even though his injury was constitutionally compensable under state law. *Id.* at 126–27, 82 S.Ct. at 1203–04. Indeed, the Court held that it was permissible for a claimant to obtain a LHWCA award subsequent to a state law award, where the first award was credited against the LHWCA award to prevent a double recovery. *Id.* at 131, 82 S.Ct. at 1205.

In *Moores' Case*, 323 Mass. 162, 80 N.E.2d 478 (1948), the Supreme Judicial Court of Massachusetts applied *Davis* to a situation in which a worker had been injured while performing repair work upon a completed vessel in a dry dock upon navigable waters. Sustaining the state workmen's compensation award he received, the court commented:

[O]ur proper course is ... to regard the *Davis* case as intended to be a revolutionary decision deemed necessary to escape an intolerable situation and as designed to include within a wide circle of doubt all water front cases involving aspects pertaining both to the land and to the sea where a reasonable argument can be made either way, even though a careful examination of numerous previous decisions might disclose an apparent weight of authority one way or the other.

80 N.E.2d at 481. The Supreme Court of the United States affirmed the decision of the Massachusetts high court in a per curiam decision citing *Davis*. *Bethlehem Steel Co. v. Moore*, 335 U.S. 874, 69 S.Ct. 239, 93 L.Ed. 417 (1948). This affirmance is noteworthy because prior Supreme Court decisions had classified this type of work as falling outside of the maritime but local exception. *See Baizley Iron Works v. Span*, 281 U.S. 222, 50 S.Ct. 306, 74 L.Ed. 819 (1930); *Robins Dry Dock & Repair Co. v. Dahl*, 266 U.S. 449, 457, 45 S.Ct. 157, 158, 69 L.Ed. 372 (1925). Thereafter, the Supreme Court reversed a California Supreme Court ruling overturning a state award to a shipyard worker injured while repairing a vessel. *Baskin v. Industrial Acc. Comm'n*, 338 U.S. 854, 70 S.Ct. 99, 94 L.Ed. 523 (1949). The Court remanded, suggesting that the California Supreme Court might wish to consider *Moore's Case*. After the California Supreme Court reversed its earlier determination and awarded compensation, the Supreme Court affirmed. *Kaiser Co. v. Baskin*, 340 U.S. 886, 71 S.Ct. 208, 95 L.Ed. 643 (1950).

Like the repair of a completed ship in navigable waters, the loading and unloading of a vessel was not a task falling within the maritime but local exception. *Employer's Liability Assur. Corp. v. Cook*, 281 U.S. 233, 236, 50 S.Ct. 308, 309, 74 L.Ed. 823 (1930). Prior to *Davis*, a state compensation award to a worker injured while engaged in this task on the navigable waters would have been impermissible. But as the *Moore* and *Baskin* decisions indicate, *Davis* supplanted the rigid, and arbitrary, lines that previously existed with a presumption of constitutionality that resolved close cases in favor of injured workers.

In *Hahn v. Ross Island Sand & Gravel*, 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959), a per curiam decision, the Supreme Court advanced the *Davis* principle even

further. *Hahn* involved a petitioner who had been injured while working on a barge in a lagoon opening into navigable waters. He brought suit under a section of the Oregon workmen's compensation statute against his employer, who had secured compensation for him under LHWCA. The Oregon Supreme Court dismissed the injured worker's case. The United States Supreme Court reversed, holding as follows:

> As to cases within this "twilight zone," *Davis*, in effect, gave an injured waterfront employee an election to recover compensation under either the Longshoremen's Act or the Workmen's Compensation Law of the State in which the injury occurred. It seems plain enough that petitioner's injury occurred in the "twilight zone," and that recovery for it "through workmen's compensation proceedings," could have been, and in fact was, validly "provided by State law"— the Oregon Workmen's Compensation Act.... Therefore, the Longshoremen's Act did not bar petitioner's claim under state law. But since his employer had elected to reject them the automatic compensation provisions of the Oregon Workmen's Compensation Act did not apply to the claim.... [T]hat law provides, however, that when an employer has elected to reject the Act's automatic compensation provisions his injured employee may maintain in the courts a negligence action for damages. Of course, the employee could not do this if the case were not within the "twilight zone," for then the Longshoremen's Act would provide the exclusive remedy. Since this case is within the "twilight zone," it follows from what we held in *Davis* that nothing in the Longshoremen's Act or the United States Constitution prevents recovery.

*Id.* at 273, 79 S.Ct. at 267. *Hahn* thus makes clear that within the twilight zone, a state tort remedy does not violate the constitutional principle enunciated in *Jensen*, and also that in certain circumstances a state tort remedy was available to a worker covered by LHWCA.

Roughly contemporaneous with these decisions, the Supreme Court rendered decisions that reduced the importance of LHWCA in compensating the injuries of longshoremen. In *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Court held that a shipowner's warranty of seaworthiness extended to a longshoreman injured while loading the vessel, because loading and unloading vessels was historically a task of the ship's crew and LHWCA was not intended to deprive longshoremen of their traditional remedies of the seas. Thus, an injured longshoreman could both obtain a no-fault LHWCA compensation award from his employer, and pursue a strict-liability unseaworthiness award against the vessel upon which he was injured.

In *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that a shipowner who was forced to pay damages to a longshoreman injured by his employer's unsafe storage of cargo could recover indemnity from the longshoreman's employer. The Court agreed that § 905's "obvious purpose ... is to make the statutory liability of an employer to contribute to its employee's compensation the exclusive liability of such employer to its employee, or to anyone claiming under or through such employee, on account of his injury or death arising out of that employment." *Id.* at 129, 76 S.Ct. at 235. However, the Act reserved to employees the right to proceed against third parties like shipowners. *Id.* at 130, 76 S.Ct. at 235. Section 905 protected stevedores from any liability flowing from its breach of a duty to its longshoreman-employee, but the Court found that such liability for indemnity could be "grounded upon the [employer's] breach of its purely consensual obligation *owing to the shipowner* to stow the cargo in a reasonably safe manner." *Id.* at 131–32, 76 S.Ct. at 236 (emphasis in original). This serious diminution of the employer's protection from tort liability was further advanced in *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), in which the Supreme Court held that a longshoreman could sue his employer directly for unseaworthiness where his

employer was the owner *pro hac vice* of the vessel whose unseaworthiness caused his harm.

"The net result [of this series of holdings] ... was to make the stevedore absolutely liable for statutory compensation in all cases and to deny him protection from additional liability in the cases in which his negligence could be established." *Jones & Laughlin Steel v. Pfeifer,* 462 U.S. 523, 531 n. 7, 103 S.Ct. 2541, 2547 n. 7, 76 L.Ed.2d 768 (1983). That is, the employee could have his workmen's compensation, and his tort damages too, all at the expense of his employer. When coupled with a level of LHWCA compensation that was inadequate, the availability of the unseaworthiness remedy led to a large amount of litigation, accompanied by crowded court dockets, the need to pay lawyers, and all the other social costs of lawsuits, without a real benefit to workers. See S.Rep. No. 92–1125, 92d Cong. 2d Sess., 3–5 (1972); H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., 3–5 (1972), 1972 U.S.Code Cong. & Admin. News 4698.

Congress acted to remedy this situation in 1972. Maritime labor interests desired markedly higher LHWCA benefits. Maritime employers indicated they could provide higher benefits "only if the [LHWCA] were to again become the exclusive remedy against the stevedore as it had been intended since its passage in 1927 until modified by various Supreme Court decisions." *Id.* at 5. Congress obliged these concerns by substantially increasing the level of compensation available under LHWCA, eliminating the strict-liability unseaworthiness remedy and the right of the shipowner to obtain indemnity from the stevedore-employer, and substituting for the unseaworthiness action a maritime negligence claim that could be brought by a longshoreman against a vessel that caused him injury. *See* 33 U.S.C. § 905(b).[13] A central purpose of these changes was to minimize the need for litigation and to increase the

importance and adequacy of statutory compensation as the principal method for remedying longshore injuries. *Rodriguez v. Compass Shipping Co.,* 451 U.S. 596, 616, 101 S.Ct. 1945, 1957, 68 L.Ed.2d 472 (1981).

Realizing that the increase in the level of LHWCA benefits would create a large disparity between the level of benefits ordinarily available to a longshoreman injured over the navigable waters and one injured on the adjacent pier and thus only covered by state acts, Congress also amended LHWCA to expand its coverage beyond the traditional navigable waters to specific adjoining areas, such as piers and other adjoining areas "customarily used by an employer in loading, unloading, dismantling, or building a vessel." *See* 33 U.S.C. § 903(a). Congress was aware that modern longshoring techniques involved an increased amount of work on land, and believed that the availability of compensation should not turn upon the "fortuitous circumstance of whether the injury occurred on land or over water." S.Rep. No. 92–1125 at 13; H.R.Rep. No. 92–1441 at 10–11, 1972 U.S.Code Cong. & Admin.News 4708. In essence, Congress sought to provide a seamless blanket of coverage for all longshore injuries. *Id.*

In 1980, the Supreme Court addressed the question of whether this landward extension of LHWCA's coverage displaced states from applying their own workmen's compensation schemes to land-based injuries which fell under this expanded federal coverage. *Sun Ship, Inc. v. Pennsylvania,* 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980). The Court unanimously answered that there was no inconsistency between the application of state workmen's compensation remedies in this situation and the federal compensation scheme as embodied in LHWCA, and held that a longshoreman injured on a land-based LHWCA situs could receive *both* an award under state compensation law and

---

**13.** A longshoreman's employer can be sued in its capacity as a vessel under § 905(b) without running afoul of § 905(a). However, the employer may not be held liable for damages caused by its actions in its role as a stevedore,

but only for damages caused by its actions in its capacity as a "vessel". *Jones & Laughlin Steel v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

LHWCA, since the two awards were complementary rather than exclusive, and a prior award under state law would be credited against the LHWCA award. *Id.* at 725 & n. 8, 100 S.Ct. at 2439 & n. 8.

The Court found in *Sun Ship* that Congress had not, during the process of amending the Act in 1972, expressed any intent to alter the "accepted understanding that federal jurisdiction would coexist with state compensation laws in that field in which the latter may constitutionally operate under the *Jensen* doctrine." *Id.* at 722, 100 S.Ct. at 2437; *see also* Gilmore & Black, *supra,* at 426. Rather, the landward shift merely extended the zone of concurrency recognized in *Davis* and *Calbeck* to encompass those land areas now covered by LHWCA as amended.[14]

The Court specifically rejected the argument that concurrent jurisdiction was inappropriate because "concurrent jurisdiction could result in more favorable awards for workers' injuries than under an exclusively federal compensation system." *Id.* at 724, 100 S.Ct. at 2438. The Court noted that a concern of the Congress was the paucity of state benefits and found no evidence that Congress was "concerned about a disparity between adequate federal benefits and *superior* state benefits." *Id.* (emphasis in original). "[T]he *quid pro quo* to the employers for the landward extension of the LHWCA by the 1972 amendments was simply abolition of the longshoremen's unseaworthiness remedy." *Id.* Nor was the Court persuaded that the fact that federal and state compensation systems were different "gives rise to a conflict that from the employer's point of view, necessitates exclusivity for each system within a separate sphere." *Id.* at 725, 100 S.Ct. at 2439. Given the uncertainties which still attended the question of whether a claim fell within or without LHWCA under the "status and situs" test, employers would be forced to comply with state laws even if LHWCA was exclusive within its realm since claims could easily fall outside its coverage. *Id.*

at 725, 100 S.Ct. at 2439; *see also Herb's Welding, Inc. v. Gray,* 470 U.S. at 426, 105 S.Ct. at 1428 ("[T]here will always be a boundary to coverage, and there will always be people who cross it during their employment.").

Importantly, the Court found that the exclusive remedy provision of § 905(a) of LHWCA provided no obstacle to the provision of a concurrent state remedy. As this section predated *Davis* and *Calbeck,* the Court indicated that those decisions construed the section as not excluding remedies offered by other jurisdictions, and found that Congress did not, by its 1972 amendments, reject this interpretation. *Id.,* 447 U.S. at 722–23 n. 4, 100 S.Ct. at 2437–38 n. 4.

Though *Sun Ship* itself dealt only with allowing states to continue to exercise jurisdiction over land-based injuries falling under LHWCA, the Court made clear the continued vitality of *Davis. Id.* at 720–22, 100 S.Ct. at 2436–37; *Perini,* 459 U.S. at 309 n. 19, 322–23, 103 S.Ct. at 643 n. 19, 649–50; 4 Larson, *supra,* § 89.73 at 16–412 (The "Court meant [*SunShip* ] not merely to extend the concurrent-jurisdiction doctrine to the new land areas covered [by LHWCA], but to preserve it to the navigable waters areas it had been applied to."). In fact, the Court placed importance on the legislative history's failure to express an intention to overrule *Davis* and *Calbeck* —calling it "a significant omission in light of the care which the Reports elsewhere take in identifying the Supreme Court cases to be overturned by the abolition of longshoremen's actions for unseaworthiness." *Id.* at 722, 100 S.Ct. at 2437.

In 1984 Congress again overhauled LHWCA. In the course of the legislative proceedings Congress considered amending § 905(a) of LHWCA to preclude a worker eligible for LHWCA benefits from receiving an award under a state compensation statute. The proposed amendment provided that the "liability of an employer prescribed in section [90]4 shall be exclusive

---

**14.** The Court also noted that the Congress deleted the language of § 903(a) that, prior to *Calbeck,* had been thought to limit the availability of LHWCA compensation to those injuries not

constitutionally compensable under state law. 447 U.S. at 720–21 & n. 2, 100 S.Ct. at 2436–37 & n. 2.

and in place of all other liability *including any liability imposed by or arising out of any other workers' compensation law....*" S.Rep. No. 98–81, 98th Cong., 1st Sess., at 50 (1983); H.R.Rep. No. 98–570, 98th Cong., 1st Sess., at 26 (1983), 1984 U.S.Code Cong. & Admin.News 2759. This amendment passed the Senate but was not adopted by the House of Representatives or the conference, and did not become law. H.R. Conf. Rep. No. 1027, 98th Cong., 2d Sess., at 23–24 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2773–74. Congress did, however, amend LHWCA by adding a section providing that "any amounts paid to an employee for the same injury ... for which benefits are claimed under this chapter pursuant to any other workers' compensation law or [the Jones Act] ... shall be credited against any liability imposed by this chapter." 33 U.S.C. § 933(e).[15] Hence, the 1984 amendments did not amend LHWCA to overrule the holding in *Sun Ship.*

### B.

The foregoing case law indicates that the Virgin Islands could validly provide Peter with a workmen's compensation remedy if he had been exposed to jet fuel only on the dock during the "hose around." *Nordenholt,* 259 U.S. at 263, 42 S.Ct. at 473. Moreover, based on the concept of including within the twilight zone of concurrent jurisdiction "all waterfront cases involving aspects pertaining both to the land and to the sea," *Moore's Case,* 80 N.E.2d at 481, Peter's injuries might be in the twilight zone even if he had been exposed to jet fuel only while on board loading the tankers from a land based hose, given his land-based status and the fact that tasks related to loading comprised but a part of his duties. Whether or not that be true, however, given the pragmatic approach of the Supreme Court in this area, we are confident that this is a twilight zone case since

substantial portions of the injury-causing exposure occurred on the dock and it would be unreasonable to require the injured worker to demonstrate precisely how much of his injury is attributable to shoreside exposure. Thus, as an initial step in our analysis, we conclude that the Virgin Islands could provide a workmen's compensation remedy to an injured longshoreman whose injury results from exposure to a toxic substance while loading vessels over an extended period of time where a substantial amount of the exposure occurred on land. As a result, we reject Hess's argument that, under *Jensen,* federal maritime law preempts application of any state law to Peter's injury.

### C.

■ In this case, however, we deal not with an award of compensation benefits but with a common law action for negligence. The more difficult issue raised by Hess turns on the effect of § 905(a) upon the availability of state tort relief for a plaintiff whose injury falls within the twilight zone. This raises a question of federal supremacy that requires us to consider whether LHWCA (1) evidences a congressional intent to preempt the entire area of compensation for this kind of injury, or (2) is inconsistent with the provisions of a state tort remedy so that it would be impossible for the defendant to comply with both federal and state law, or (3) whether the state tort remedy "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Schneidewind v. A.N.R. Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988). We believe that *Sun Ship* rules out any argument that LHWCA was intended to preempt any state legislation effecting events occurring within the twilight zone. Moreover, we think it clear that it is not impossible for Hess to comply with both LHWCA and the Virgin Islands

---

**15.** What legislative history exists with respect to this provision indicates that members were focusing on the prevention of double recovery of workmen's compensation benefits. There is no indication that Congress focused, one way or another, on state tort damages. S.Rep. No. 98–

81, 98th Cong., 1st Sess., 30 (1983); 130 Cong. Rec. H2488 (daily ed. April 9, 1984) (Explanation of House Amendment to S. 38, The Longshoremen's and Harbor Workers Act Amendments of 1983).

law relied upon by Peter. This leaves Hess' contention that the district court's application of Virgin Islands law in this case frustrates the "full purposes and objectives of Congress" as reflected in LHWCA. We focus our inquiry on that issue.

In addressing this issue, we acknowledge that the Supreme Court has counseled courts not to strike down state regulation in the admiralty area, "absent a clear conflict with the federal law." *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 341, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973); *see also Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 272–73, 93 S.Ct. 493, 506–07, 34 L.Ed.2d 454 (1972). At the same time, however, while "states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court." *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409–10, 74 S.Ct. 202, 204–05, 98 L.Ed. 143 (1953).[16] If § 905(a) was intended by Congress to confer immunity on an employer from state as well as federal negligence liability, Hess has been deprived of a federally guaranteed right and Peter's judgment cannot stand.

In determining the reach of § 905(a), we begin by considering its language:

The liability of an employer ... shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone *otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death....*

33 U.S.C. § 905(a) (emphasis added). This section's plain language evinces an unmistakable intention to codify the *quid pro quo* that underlies most workmen's compensation statutes—the employer provides no-fault compensation in exchange for immunity from tort liability for damages.

Indeed, the Supreme Court has often opined that the LHWCA embraces this *quid pro quo:*

the Act is not a simple remedial statute intended for the benefit of the workers. Rather, it was designed to strike a balance between the concerns of the longshoremen and harbor workers on the one hand, and the employers on the other. Employers relinquished their defenses to tort actions in exchange for limited and predictable liability. Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail.

*Morrison–Knudsen Construction Co. v. Director, OWCP*, 461 U.S. 624, 636, 103 S.Ct. 2045, 2052, 76 L.Ed.2d 194 (1983); *see also Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268, 281–82 & n. 24, 101 S.Ct. 509, 516, 66 L.Ed.2d 446 (1980); *Ryan*, 350 U.S. at 129, 76 S.Ct. at 235. The Supreme Court has enforced this *quid pro quo* by denying a negligence recovery under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60, to railroad workers covered by LHWCA. *Schwalb*, 110 S.Ct. 381; *Pennsylvania R.R. Co. v. O'Rourke*, 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1952); *Nogueira v. New York, New Haven & Hartford R.R. Co.*, 281 U.S. 128, 50 S.Ct. 303, 74 L.Ed. 754 (1930); *see also Harmon v. Baltimore & Ohio R.R.*, 741 F.2d 1398 (D.C.Cir.1984).

In the context of the policy decision reflected in § 905(a), we are unable to distinguish state imposed negligence liability from federally imposed negligence liability, and Peter has tendered no suggestion as to why Congress might have wanted to grant immunity from the latter and not the former. Peter's judgment based on Virgin Islands' law is every bit as disruptive of Congress' *quid pro quo* as would be a negligence judgment based on federal mar-

---

**16.** Thus, it has been held that the exclusivity clause in a state workmen's compensation statute may not be raised as a bar to a maritime cause of action. *Purnell v. Norned Shipping B.V.*, 801 F.2d 152 (3d Cir.1986), *opinion on rehearing*, 804 F.2d 248 (3d Cir.1986), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1576, 94 L.Ed.2d 767 (1987); *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841 (5th Cir.1978).

itime law. Accordingly, we do not find it surprising that the only court of appeals to have considered the issue has concluded that § 905(a) bars a state tort recovery from a LHWCA employer. *Rosetti v. Avondale Shipyards, Inc.*, 821 F.2d 1083 (5th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Lorton v. Diamond M Drilling Company*, 540 F.2d 212 (5th Cir.1976).[17]

Peter's argument against preemption rests primarily on *Sun Ship* and *Hahn* and this has occasioned our extended review of the case law necessary to put those cases in proper perspective. As we have noted, *Sun Ship* holds that in the twilight zone a state workmen's compensation remedy is not preempted even though it provides greater compensation for the employee than is provided by LHWCA. This holding, however, emanated from a concern that a return to the exclusivity of compensation remedies would recreate on land what the "maritime but local" dilemma had created over the navigable waters. 447 U.S. at 720 & 725, 100 S.Ct. at 2436 & 2439. The Court recognized that to ensure that every worker had access to a no-fault remedy, it was necessary to refrain from holding that the availability of a federal compensation remedy excluded the possibility of a compensation remedy under state law. *Id.* at 725, 100 S.Ct. at 2439.

LHWCA itself, however, is a recognition that there is a substantial difference between liability for a fixed and determinable compensation award and liability for unlimited damages in tort. The Act is premised on the notion that employers will accept the burden of no-fault compensation recovery in exchange for predictable liability for injuries suffered by workers. Though the Supreme Court has held that the 1972 amendments were not an expression of Congress' intent to make LHWCA the exclusive source of compensation for longshoreman, the legislative history of the 1972 amendments does make clear that Congress was motivated by two relevant considerations. First, Congress intended that compensation, not tort damages, were to be the primary source of relief for workplace injuries for longshoremen against their employers. Second, Congress believed that the incentives for tort litigation created by the *Sieracki–Ryan–Reed* case law had done little to aid maritime workers or the public interest.

Concurrent jurisdiction in the "twilight zone" is a judicial construct borne of necessity and designed to eliminate the harshness of the maritime but local era. The boundaries of this doctrine should be determined by the problems that gave rise to its creation and we decline to apply it in a way that would undermine the policy reflected in § 905(a).

The *Hahn* case is the only federal case since the enactment of LHWCA to sanction a state tort recovery for an injury within the scope of that Act. While the Supreme Court there sustained a damage recovery,

---

17. Two state Supreme Courts have addressed a very similar question, and have reached conflicting results. In *Poche v. Avondale Shipyards, Inc.*, 339 So.2d 1212 (La.1977), *appeal dismissed for want of jurisdiction*, 434 U.S. 803, 98 S.Ct. 31, 54 L.Ed.2d 60 (1977), the Louisiana Supreme Court held that survivors of a land-based ship repair worker could sue the decedent's employer's officers and his fellow servants under Louisiana law. Though LHWCA compensation was clearly available, and LHWCA bars such actions, LHWCA was held not to bar this suit since the case was in the realm of concurrency and the court felt it was "obvious that unless the state statute provides benefits or rights beyond those accorded by federal law, there would be no reason to elect to pursue the state remedy." *Id.* at 1221. *But see Sider v. Robin Temporary Service*, 515 So.2d 1123 (La.Ct.App.1987) (section 905(a) of LHWCA barred state negligence

claim against borrowing employer of worker injured while cleaning barge on Mississippi River), *writ denied*, 519 So.2d 146 (La.1988).

The Alabama Supreme Court, on the other hand, held that a worker injured on land could not pursue a state law negligence claim against his fellow employee where LHWCA applied, stating:

We can perceive no greater conflict than that which would be presented if we allowed this employee to sue his co-employee because he was a land-based maritime worker, and a maritime worker injured on a navigable water would be precluded from maintaining such a suit; therefore we are persuaded to hold that the exclusivity provisions of [LHWCA] apply and that the state action is barred.

*Fillinger v. Foster*, 448 So.2d 321, 326 (Ala.), *cert. denied*, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984).

the Court's holding is not persuasive authority for Peter's position in this case. The Oregon statute involved in *Hahn,* like most workmen's compensation statutes—including LHWCA—provided that if an employer covered by the statute failed to secure workmen's compensation coverage it would be subject to a negligence action in which it would be denied common law defenses. 358 U.S. at 273, 79 S.Ct. at 267. The employer in *Hahn* had not obtained such coverage and it was under this provision that the damage judgment was obtained against it.

Thus, in *Hahn* the state negligence liability was part of the state's workmen's compensation scheme and was imposed only as a sanction for the employer's failure to secure coverage. The existence and function of that liability was entirely consistent with Congress's intent to ensure a seamless intersection between state and federal compensation coverage. That negligence liability in this context is entirely consistent with the scheme imposed by LHWCA is apparent from Congress's inclusion of a similar sanction in LHWCA.

Here, Hess arranged coverage for Peter under both LHWCA and the Virgin Islands' compensation Act. The application of Virgin Islands tort law in situations like this does not further the availability of no-fault compensation for injured maritime workers; it simply obstructs the purposes of LHWCA by depriving maritime employers of their side of LHWCA's *quid pro quo.*

We hold that where an employer has obtained workmen's compensation coverage for its LHWCA employee under both LHWCA and the state or territorial statute, § 905(a) and the Supremacy Clause bar a state or territorial tort recovery against the employer.

### IV.

We conclude that (1) Peter was a "borrowed servant" and Hess an "employer" under LHWCA, (2) Peter's injuries were compensable under LHWCA, and (3) § 905(a) and the Supremacy Clause bar the Virgin Islands from imposing negligence

liability on Hess. Accordingly, we will reverse and remand with instructions that judgment be entered for Hess.