633 F.2d 1070
 Leroy WHITE, Claimant, Petitioner,
v.
NEWPORT NEWS SHIPBUILDING & DRY DOCK COMPANY (Self-Insured)
Employer, Respondent,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, Party in
Interest.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United
States Department of Labor, Petitioner,
v.
NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Respondent.
 Nos. 79-1134, 79-1141.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1980.
Decided Sept. 15, 1980.
 
 R. M. Brown, Jr., Newport News, Va. (Hudgins & Neale, Newport News, Va., on brief), Mark C. Walters, U. S. Dept. of Labor, Washington, D. C. (Carin Ann Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol., Washington, D. C., on brief), for petitioners.
 Junius C. McElveen, Jr., Washington, D. C. (Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., on brief), for respondent.
 
 
 1
 Before WINTER and PHILLIPS, Circuit Judges, STAKER*, District judge.
 
 STAKER, District Judge:
 
 2
 Employee Leroy White was injured while unloading pipe in the shipyard of Newport News Shipbuilding and Dry Dock Company, and claimed compensation under the Longshoremen's and Harbor Workers' Compensation Act, as amended, 33 U.S.C. §§ 901, et seq.
 
 
 3
 The threshold issue here is whether White was a shipbuilder entitled to compensation under the Act. After hearing, the administrative law judge (ALJ) held inter alia that White was a shipbuilder and was so entitled, and that holding was reversed by decision of the Benefits Review Board upon Newport News Shipbuilding's appeal thereto.[1] The Board did not decide other issues raised by White's appeal to the Board of other rulings and findings of the ALJ, and White presents them here. White, in No. 79-1134, and the Director, Office of Workers' Compensation Programs, in No. 79-1141, filed here their separate petitions for review from the Board's decision, and consolidation thereof was ordered. We reverse the decision of the Board.
 
 
 4
 The uncontroverted evidence showed that White's work was performed in an area at or near Dry Dock # 3 of the shipyard at which suppliers delivered pipe of various grades intended for use in ship and submarine construction. Suppliers delivered pipe there on trucks or flatcars from which it was unloaded by an overhead crane. It remained stored there until subsequently distributed as needed to the fabricators who used it in such construction. White's duties included his helping in such unloading operations by indicating the specific points at which the crane was to place the craneloads of pipe unloaded from the trucks or flatcars, and after they were so placed, by disengaging the cable therefrom, and his then sorting the pipe and painting a color code upon, and also etching, each piece of pipe to identify its grade to the shipyard workers. When pieces of pipe were needed for use in fabrication, the "trades" at the fabricating site would themselves bring, or else the shipyard's transportation department would send, a truck for the needed pipe and transport it from there to the fabricating site. In either case, White's duties also included the loading of the needed pipe on such trucks. His regular duties also included the routine verification by him that each shipment of pipe delivered by the suppliers was that described upon the invoice therefor, and his so indicating by signing the invoice and delivering a copy thereof to each of the delivering supplier and the shipyard office. Though it was not a part of White's regular duties to do so, on occasion he sawed pipe to lengths specified by the fabricators before it was transported to them from the area where he worked. At the time of the injury, White's job title, according to his testimony, was storekeeper, and according to that of his supervisor, was warehouseman; however, both testified that it was classified as clerical by the union contract under which White was employed. At the time of his injury, White was assisting in the unloading of several tons of pipe at Dry Dock # 3 of the shipyard when cables of the overhead crane snapped, causing a craneload of pipe to fall on his leg.
 
 
 5
 In order to have been an employee entitled to compensation under the Act, White must meet the two-prong situs and status test. Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); Newport News Shipbuilding & Dry Dock Co. v. Graham, 573 F.2d 167 (4th Cir. 1978), cert. denied, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978); P. C. Pfeiffer Co., Inc. v. Ford, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979).
 
 
 6
 Under the "situs" requirement, a geographical one, White must have been employed "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel.)" 33 U.S.C. § 903(a). The uncontroverted evidence clearly shows and it is not seriously disputed that White's place of employment in the shipyard fell within the situs requirement of that provision of the Act.
 
 
 7
 Vigorously contested by the parties, however, is whether White's job functions fulfilled the "status" requirement, to meet which White must have been "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker ..." 33 U.S.C. § 902(3).
 
 
 8
 White contends that he was a shipbuilder engaged in maritime employment within the meaning of 33 U.S.C. § 902(3). He asserts that, given his job functions as shown by the evidence, then the liberal construction which must be accorded the provisions of the Act in conformance with its remedial purposes under pertinent case law, together with applicable case law by which the "status" issue must be determined, require that he be held to have been engaged in maritime employment within the meaning of 33 U.S.C. § 902(3), and thus to have fulfilled the status requirement.
 
 
 9
 Conversely, Newport News Shipbuilding contends that White was not engaged in maritime employment. It asserts that White's duties were merely clerical, wherefore he is excluded from coverage; that his duties were unrelated to and not directly involved in the production or maintenance of component parts or equipment involved in shipbuilding, did not involve the alteration of materials used in ship construction in preparation for fabrication and did not constitute the integral part of the production process that this court looked to in Graham in order to determine whether claimants have met the status test of the Act's coverage; and that White was essentially an unskilled worker whose work was merely incidental to production and had no close functional nexus to shipbuilding.
 
 
 10
 Both White and Newport News Shipbuilding cite, but disparately apply to the facts here, almost all of the same cases as authority in support of their antipodal positions on the status issue.
 
 
 11
 That White's duties included clerical ones is not decisive of his status. Northeast Marine Terminal Co., Inc. v. Caputo, supra, held Blundo, employed as a checker, i. e., a clerical worker, participating as such in the unloading of cargo, to have been engaged in maritime employment.
 
 
 12
 Furthermore, White's primary duties were not clerical ones. In Maher Terminals, Inc. v. Farrell, 548 F.2d 476 (3d Cir. 1977), Farrell had once worked as a checker involved in longshoring, but for some time prior to his injury had worked as a clerk in an office where his primary duties were clerical ones not involving his participation in cargo loading or unloading, though on occasion he left the office to examine markings on cargo. The court said: "What is controlling is the nature of his primary duties. As we perceive the congressional intent, that is the sole test. Farrell's primary duties being that of a clerk and not a checker, he is excluded from coverage." Here, in contradistinction to the facts in Farrell, the only "clerical" duty, in the traditional sense of that term, that White's job functions included was his verifying that pipe received at the shipyard conformed to the description thereof on the invoices therefor and his so indicating on the invoices. That duty was incidental to his primary duties of loading, unloading, color coding and etching pipe, and constituted a negligible portion of the whole of his duties.
 
 
 13
 Moreover, that the union contract generally classified his job as a clerical one does not alter the factual nature of his primary duties and is thus not controlling. Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533, 539 n.16 (5th Cir. 1976), vacated, 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), reaff'd, 575 F.2d 79 (5th Cir. 1978), cert. denied, 440 U.S. 967, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979); Northeast Marine Terminal Co., Inc. v. Caputo, supra, 432 U.S. n.30, at 268, 97 S.Ct. at 2359.
 
 
 14
 In determining whether an employee meets the status test, the critical enquiry is not whether the employee performed clerical duties, but rather whether the employee was engaged in maritime employment within the meaning of 33 U.S.C. § 902(3), which we must now decide as to White.
 
 
 15
 Various phrases have been used by the courts generally to describe and delineate those functions that constitute engaging in maritime employment within the meaning of the 1972 amendments to the Act. See, e. g., Alabama Dry Dock & Shipbuilding Co. v. Kininess, 554 F.2d 176 (5th Cir. 1977), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) ("directly involved" in shipbuilding); Dravo Corp. v. Banks, 567 F.2d 593 (3d Cir. 1976) (a necessary "ingredient" of shipbuilding); Northeast Marine Terminal Co., Inc. v. Caputo, supra (an "integral part" of the unloading process); Dravo Corp. v. Maxin, 545 F.2d 374 (3d Cir. 1976), cert. denied, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (an "integral part" of ship construction). In Newport News Shipbuilding & Drydock Co. v. Graham, supra, we held that Graham, who was injured while working in a submarine shop on a sonar shield later to be installed in a submarine, met the status test because he was engaged in an "integral part" of submarine construction, and that Jones, who was injured in a foundry while oiling machinery used to build ships, also met the status test because his maintenance of that machine was "(e)ssential to keeping the shipyard's machinery in working order for the construction of ships ..."
 
 
 16
 White's regular functions of affixing the color code and etching to the individual pieces of pipe for the purpose of identifying their respective grades to the ship fabricators effected a physical change to each piece of pipe and gave each an added characteristic essential to identify it by grade for its proper application and use by the fabricators in the construction by them of ships at the shipyard. Hence, White's performance of those functions on the pipe were the first steps taken physically to alter that pipe for its use in ship construction, and his doing so thus constituted an "integral part" and necessary "ingredient" of shipbuilding and also caused him to be "directly involved" therein, as did his occasional cutting of pipe for ship construction. His doing so thus comes within the phraseology descriptive of maritime employment used in all of Graham, Maxin and Kininess. White's doing so thus constituted the performance by him of maritime employment, i. e., shipbuilding, within the meaning of 33 U.S.C. § 902(3), and he thereby met the status test.
 
 
 17
 White requests us also to decide, and not to remand to the Board for decision, the following other issues which he appealed to the Board and the Board did not decide: First, whether there was substantial evidence on the record as a whole to support the ALJ's finding that White's permanent partial disability was limited to only 35%; and second, whether the ALJ's decision and order were contrary to law by omitting therefrom the imposition of the statutory penalties pursuant to 33 U.S.C. § 914(e) and interest.
 
 
 18
 As to this first issue, we hold there was substantial evidence on the record as a whole to support the ALJ's finding that White suffered permanent partial disability of only 35%. The record shows that medical testimony was not offered at White's hearing; the medical evidence rather consisted of letters from physicians respectively stating that White had "total disability amounting to 50% of his left lower extremity" and "25% permanent partial damage to left lower extremity." Based upon that evidence and the ALJ's "observation of the Claimant (White)," the ALJ found White to have suffered permanent partial disability of 35%.
 
 
 19
 Under the provisions of 33 U.S.C. § 919(a) and (d), the deputy commissioner has full power and authority "to hear and determine all questions" in respect to claims, and the administrative law judge is vested with all powers and responsibilities statutorily vested in the deputy commissioner with respect to such hearings. The administrative law judge is thus the finder of the facts with respect to the hearing of claims. In the hearing of White's claim, the ALJ was not bound to accept the opinion of either of the two physicians. He properly could, as he did, consider and rely upon his own observations and judgment in connection with all of the evidence before him in reaching a finding on the factual issue of the percentage of permanent partial disability suffered by White. Ennis v. O'Hearne, 223 F.2d 755, 758 (4th Cir. 1955); Contractors v. Pillsbury, 150 F.2d 310 (9th Cir. 1945).
 
 
 20
 As to the second issue, the ALJ merely recited in his opinion and order that "No interest or statutory penalties are appropriate," without stating therein why the awarding thereof was inappropriate. The provisions of 33 U.S.C. § 914(e) require an employer either to compensate a claimant or to file with the deputy commissioner a notice controverting his right to compensation within 14 days after the employer learns of the claimant's injury, and if he fails so to do, then the assessment of the penalty therein provided is mandatory unless the employer makes a showing that nonpayment is due to conditions beyond the employer's control. Graham, supra at 171; Newport News Shipbuilding & Dry Dock Co. v. Director, Office of Workers' Compensation Programs, U. S. Dep't of Labor, 594 F.2d 986 (4th Cir. 1979). The ALJ having thus denied assessment of penalty and interest without stating any reason for such denial, and it being requisite to effective appellate review that the ALJ articulate the reason for denial thereof, if any there be, we must and do hereby remand to the Board for such further proceedings to be had as shall be necessary to satisfy that requisite.
 
 
 21
 White's attorney has moved for the allowance of an attorney fee for his services incident to appeal here pursuant to 33 U.S.C. § 928(a), which provides for allowance of reasonable attorney's fees to counsel of a claimant who has successfully prosecuted his claim after the employer has denied liability for compensation. The procedure prescribed for the allowance of such fees by this court has previously been established in Graham, supra at 171. White's attorney has substantially complied with that procedure, and the employer has stated that it has no objection to the award of an attorney fee in the amount of $1,160.00, which we find to be reasonable and accordingly award.
 
 
 22
 We accordingly reverse the decision of the Benefits Review Board and Remand to the Board for further proceedings consistent herewith.
 
 
 23
 REVERSED AND REMANDED.
 
 
 
 *
 Honorable Robert J. Staker, United States District Judge for the Southern District of West Virginia, sitting by designation
 
 
 [1]
 Board Member Julius Miller dissenting