**SEA–LAND SERVICE, INC., Petitioner,**

v.

**John J. ROCK and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 91–3161.

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1991.

Decided Jan. 7, 1992.

Keith L. Flicker (argued), Richard L. Garelick, Flicker & Associates, New York City, for petitioner.

Jorden N. Pedersen, Jr. (argued), Baker, Garber, Duffy & Pedersen, Hoboken, N.J., for respondent John J. Rock.

David S. Fortney, Deputy Sol. of Labor, Carol A. De Deo, Associate Sol., Janet R. Dunlop, for Longshore, Michael S. Hertzig, Atty. (argued), U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for respondent Director, Office of Workers' Compensation Programs.

Before BECKER, GREENBERG, and GARTH, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

John J. Rock seeks compensation under the Longshore and Harbor Workers' Com-

**58**

pensation Act (Act), 33 U.S.C. § 901 *et seq.*, for personal injuries sustained in the course of his employment with Sea–Land Service, Inc. (Sea–Land) as a "courtesy van" driver who transported passengers primarily within his employer's marine terminal. This case presents the question of whether Rock was engaged in "maritime employment" and is thus entitled to compensation under the Act. The administrative law judge denied benefits, but the Benefits Review Board (board) reversed on the basis that Rock's functions were "essential to maritime industry." Because we find that Rock's occupation was not essential to the process of loading and unloading a vessel, we will set aside the board's determination.

## I. Background Facts and Procedural History

Sea–Land operates a 200–acre container loading and unloading terminal in Port Elizabeth, New Jersey. For security reasons Sea–Land does not permit private vehicles in the facility so it provides two white courtesy vans for the transportation of executives, visitors, seamen, ship's crewmen, clerical workers, customs officials and customers. Separate yellow buses transport the longshoremen who work at the facility. Other groups, such as shore gangs, crane workers, lashing personnel and linemen, are transported by their own trucks or vans.

Rock began working for Sea–Land as a longshoreman and "hustler" driver in the early 1960's. In 1979, based on seniority, Rock elected the job of driving one of the white courtesy vans, but he maintained his status as a member of the International Longshoremen's Association. As a courtesy van driver, Rock was required to transport individuals within the facility and was also required to perform errands outside the facility, including gathering mail and transporting people to airports and hotels. According to a supervisor, Rock was not authorized to transport longshoremen, but

Rock testified at his hearing that he did on occasion provide such transportation at his supervisor's instruction. Rock did not haul cargo and did not perform repairs or equipment maintenance. When he did not have an assignment, Rock waited at the marine operations building, where he spent approximately 60% of his time.

When Rock was absent from work, a warehouseman would substitute for him and drive the courtesy van. No evidence at his hearing established, however, that Rock ever substituted as a warehouseman. Thus, Rock's duties were limited to driving one of the courtesy vans from 1979 until the time of his injury.

On October 21, 1981, as he stepped from one of the courtesy vans, Rock twisted his right knee. Rock submitted a claim for benefits under the Act, and a formal hearing was held before an administrative law judge on December 13, 1983. Sea–Land did not dispute the extent of Rock's disability and it did not deny that he was injured while on a covered situs and that it is an employer under the Act. Thus, the only issue presented to the administrative law judge was whether Rock was engaged in "maritime employment" within section 902(3) of the Act.[1] The administrative law judge denied compensation benefits in a decision and order of February 7, 1985, as he concluded that Rock's job did not require him to perform any ."indisputably longshoring or maritime activities," and Rock was therefore not engaged in maritime employment as a matter of law.

Rock appealed the administrative law judge's decision and order to the Benefits Review Board which, on June 30, 1988, issued a decision and order reversing the administrative law judge's determination. The board held that, because Rock's job required him to transport various maritime personnel, customs officials and customers, his duties were "therefore essential to maritime industry and further[ed] the concerns

---

**1.** Section 902(3) of the Act in pertinent part defines an eligible employee as:

any person engaged in maritime employment, including any longshoreman or other person

engaged in longshoring operations, and any harbor-worker including a ship repairman, ship-builder, and ship-breaker....

33 U.S.C. § 902(3).

of a covered employer." The board thus held that Rock was covered under the Act, and it remanded the matter to the deputy commissioner for payment of benefits.

In August 1988, Sea–Land filed a petition for review of the board's decision and order which we dismissed on the ground that the decision and order was not a final order within the meaning of 33 U.S.C. § 921(c). On November 21, 1989, the deputy commissioner filed a compensation order awarding benefits. On November 27, 1989, Sea–Land appealed this order to the Benefits Review Board so that it could modify its June 30, 1988, decision and order to incorporate the award and issue a final order that could be appealed to this court. On January 25, 1991, the board issued a final order modifying its earlier decision and order to the extent that it found that Rock was entitled to specified compensation benefits but which otherwise reaffirmed the June 30, 1988, decision and order in all respects.[2] Sea–Land then petitioned this court for review of the January 25, 1991, order.

II. Standard of Review

■ We have appellate jurisdiction pursuant to 33 U.S.C. § 921(c), which gives the courts of appeals jurisdiction to review final orders of the Benefits Review Board. Our review is "limited to a determination of whether the Board acted in conformance with applicable law and within its proper scope of review." *Curtis v. Schlumberger Offshore Service, Inc.*, 849 F.2d 805, 807 (3d Cir.1988). When factual findings are at issue, we may make an independent factual review to determine whether the administrative law judge's findings were supported by substantial evidence, but because the parties do not contest his factual findings,[3] and the board merely repeated them in its

decision and order, such a review is not necessary here. *See Janusziewicz v. Sun Shipbuilding & Dry Dock Co.*, 677 F.2d 286, 290 (3d Cir.1982).

■ While no deference is accorded to the board's interpretation of the Act as it does not administer it, *Potomac Electric Power Co. v. Director, Office of Workers' Compensation Programs*, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514–15 n. 18, 66 L.Ed.2d 446 (1980); *Kaiser Steel Corp. v. Director, Office of Workers' Compensation Programs*, 812 F.2d 518, 521 (9th Cir. 1987), we have indicated that we will "respect" that interpretation if it is "reasonable." *Curtis*, 849 F.2d at 808. Nevertheless our review is essentially plenary for as we explained in *Director, Office of Workers' Compensation Programs v. O'Keefe*, 545 F.2d 337 (3d Cir.1976):

First, neither the Director nor the Board is the officer or agency charged with the administration of the statute. While the Director is authorized by Congress to administer the statute he does not resolve disputed legal issues involving the [Act]. Substantial questions of law arising in an adversarial context are specifically reserved for decision first by administrative law judges and then by the Board. Moreover, the Board is only a quasi-judicial body presented with select cases and not an agency involved in the overall administration of the statute ... We know of no authority which would require judicial deference to either one arm or the other under these circumstances.

*Id.* at 343. *See also Director, Office of Workers' Compensation Programs v. General Dynamics Corp.*, 900 F.2d 506, 510 (2d Cir.1990) (adopting the *O'Keefe* rationale).

2. Rock was found to be entitled to $14,304.96.

3. The Director, Office of Workers' Compensation Programs, a respondent in this case, does note one fact that does not appear in Rock's initial brief or in the board's decision. In the director's brief, it is contended that Rock was officially subject to reassignment to longshoring positions, although the director does not contest the administrative law judge's finding that he had never actually been reassigned in the two

years since he began driving the courtesy van. The director argues that this potential for reassignment to a "covered" position further strengthens Rock's contention that he is covered. As noted in the discussion below, this argument is not supported by the case law, and the fact that Rock may have been nominally subject to reassignment does not affect the conclusions in this opinion.

## III. Discussion

### A. *The 1972 Amendments to the Act*

Congress amended the Act in 1972. Before that time, it only covered injuries sustained on the actual "navigable waters of the United States (including any dry dock)." 44 Stat. 1426. Injuries occurring on land were covered by the often inadequate state compensation programs. The 1972 amendments, which extended the coverage landward, addressed the "continuing anomaly that the schedule of benefits to be applied in any case depended on whether the injury occurred on the land or water side of the gangplank." *Sea–Land Service, Inc. v. Director, Office of Workers' Compensation Programs*, 540 F.2d 629, 633 (3d Cir.1976). In broadening the coverage, Congress also noted that the advent of modern cargo-handling techniques, such as containerization, greatly increased the amount of land work required of the longshoreman. *See* H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 10–11 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin.News 4698, 4707–08.

In place of the situs test, Congress substituted a two-part test "looking both to the 'situs' of the injury and the 'status' of the injured," to determine eligibility for compensation.[4] *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 265, 97 S.Ct. 2348, 2357, 53 L.Ed.2d 320 (1977). In this new test, Congress broadened the definition of navigable waters to include "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). Because this definition included so broad a geographic area, Congress amended the definition of the persons covered under the Act by requiring that the injured worker be "engaged in maritime employment."[5] 33 U.S.C. § 902(3). *See Northeast*, 432 U.S. at 264, 97 S.Ct. at 2357. Congress defined maritime employment as "including:"

> any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include—
>
> (A) individuals employed exclusively to perform office clerical, secretarial, security, or data processing work;
>
> (B) individuals employed by a club, camp, recreational operation, restaurant, museum, or retail outlet; . . .
>
> if individuals described in clauses (A) through (F)[6] are subject to coverage under a State workers' compensation law.

33 U.S.C. § 902(3).

Congress' use of the word "including" is generally understood to indicate that the specifically-mentioned occupations are not exclusive. *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 424 n. 9, 105 S.Ct. 1421, 1427 n. 9, 84 L.Ed.2d 406 (1985).

Unfortunately, the scope of "maritime employment" is accordingly imprecise. Congress came closest to defining this key term in the "typical example" of the expanded coverage set forth in the legislative history:

> The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be

---

**4.** "The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. . . ." H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 10–11 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin.News 4698, 4708.

**5.** "The Committee does not intend to cover employees who are not engaged in loading, unload-

ing, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity." H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 11 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin.News 4698, 4708.

**6.** Subparagraphs (A) through (F) were added in 1984.

covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area.... [E]mployees whose responsibility is only to pick up stored cargo for further transshipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment.

H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 10–11 (1972), *reprinted in* 1972 U.S.Code Cong. & Admin.News 4698, 4708.

While the committee's example implies that maritime employment must have some nexus to the loading and unloading of cargo, one example cannot cover all possible permutations, and thus extensive exploration of the boundaries of maritime employment has been undertaken by both the United States Supreme Court and the courts of appeals in an attempt to clarify the Act's status requirement.

## B. *Supreme Court Cases Interpreting the 1972 Amendments*

In its two most recent decisions involving Act coverage,[7] the Supreme Court has defined the appropriate boundaries of maritime employment to include those employees "on the situs involved in the essential or integral elements of the loading or unloading process," and to exclude those who are not performing such tasks. *Chesapeake and O.R. Co. v. Schwalb*, 493 U.S. 40, 46, 110 S.Ct. 381, 385, 107 L.Ed.2d 278 (1989); *Herb's Welding*, 470 U.S. at 423–24, 105 S.Ct. at 1427. While the Court has concluded that the amendments are to be liberally construed, *Schwalb*, 493 U.S. at 46, 110 S.Ct. at 385; *Northeast*, 432 U.S. at 268, 97 S.Ct. at 2359, the Court intended that this construction fulfill the purpose of the Act by generously covering those who were formerly subject to the shifting compensation schemes and those who are involved in the loading and unloading process, but who previously may not have been covered because of their wholly land-based functions. But neither the Court nor Congress intended to expand coverage to those wholly uninvolved with ship-building or loading or unloading cargo. Thus, under the test espoused in the most recent pronouncements of the Court, we must set aside the board's determination that Rock, a van driver whose daily exertions no longer involved any direct connection with the loading or unloading of cargo, is covered under the Act.

The Supreme Court has interpreted the amendments a number of times in contexts relevant here. In *Northeast*, the Court read the "typical example" offered in the legislative history quoted above as indicating an intent "to cover those workers involved in the essential elements of unloading a vessel-taking cargo out of the hold, moving it away from the ship's side, and carrying it immediately to a storage or holding area." 432 U.S. at 267, 97 S.Ct. at 2358–59. The Court further explained that the "example also makes it clear that persons who are on the situs but are not engaged in the overall process of loading and unloading vessels are not covered." 432 U.S. at 267, 97 S.Ct. at 2359. However, the Court pointed out that the example only identifies the outer bounds of coverage, and the employees in *Northeast* were engaged in the handling of cargo as it moved between sea and land transport *after* its immediate unloading.

The claimants in *Northeast* were both involved in cargo handling: one employee, Blundo, checked and marked cargo as it was unloaded from a container, and the other, Caputo, was often responsible for unloading cargo but at the time of the accident was assigned to a task that might not normally be covered under the Act. 432 U.S. at 271–74, 97 S.Ct. at 2361–63. The Court held that both employees were covered under the status provision of the Act. Blundo, the Court concluded, was a statutory employee because he was directly

---

**7.** The Court's more recent decision in *Southwest Marine, Inc. v. Gizoni*, —— U.S. ——, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991), deals primarily with the interaction between the Act and the Jones Act and does not address the scope of "maritime employment."

involved in marking and checking cargo as it was unloaded; the task was deemed to be an integral part of the unloading process as altered by "containerization" and was intended to be reached by the amendments as evidenced by the explicit reference to "checkers" in the legislative history.[8] 432 U.S. at 271, 97 S.Ct. at 2361.

The Court confirmed Caputo's coverage by rejecting the "moment of injury" principle under which compensation changed depending on the task that the employee was engaged in at the time of injury. The Court held that "when Congress said it wanted to cover 'longshoremen,' it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 amendments, would be covered for only part of their activity." 432 U.S. at 273, 97 S.Ct. at 2362. The Court sought to avoid the "shifting coverage" that the amendments attempted to eradicate by extending coverage to an employee who throughout the day might have been assigned to unload a vessel but at the hour of the accident had been temporarily assigned to a task that might not have been covered under the Act. 432 U.S. at 274, 97 S.Ct. at 2362–63.

Two years later, in *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), the Court reaffirmed its commitment to coverage for those employees involved in the intermediate steps of moving cargo between ship and land transport. Stressing that the status test was an "occupational" and not a "geographical" test, the Court permitted coverage of an employee who was engaged in fastening cargo to railroad flat cars for land transport, although the cargo had been unloaded one day previously, and of an employee who transported cargo from a dray wagon to a pier warehouse in preparation for loading onto a ship. The Court noted that they were covered although their work never took them on board a ship, because they were engaged in an "integral part of the process of loading or unloading a ship." 444 U.S. at 75, 83, 100 S.Ct. at 333, 337.

More recently, in *Herb's Welding*, the Supreme Court reversed the Court of Appeals for the Fifth Circuit and rejected coverage for a claimant who was a welder who worked on a fixed, offshore, oil-drilling platform. 470 U.S. at 416, 105 S.Ct. at 1423. The Court noted that since fixed drilling platforms were treated as "islands" and thus were not considered suggestive of traditional maritime affairs, offshore drilling could not be considered a maritime activity and therefore welding could not be deemed maritime employment under the Act solely because it occurred on an offshore platform. *Id.* at 421–23, 105 S.Ct. at 1426–27.

In defining maritime employment to determine coverage, the Court stated the applicable status test:

> [In enacting the maritime employment requirement,] Congress did not seek to cover all those who breathe salt air. Its purpose was to cover those workers on the situs who are involved in the essential elements of loading and unloading; it is 'clear that persons who are on the situs but not engaged in the overall process of loading or unloading vessels are not covered.' While 'maritime employment' is not limited to the occupations specifically mentioned in § 2(3), neither can it be read to eliminate any requirement of a connection with the loading or construction of ships. As we have said, the 'maritime employment' requirement is 'an occupational test that focuses on loading and unloading.' The Amendments were not meant 'to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity.' *We have never read 'maritime employment' to extend so far beyond those actually involved in moving*

---

8. The Court also noted that Congress had specifically mentioned its concerns over the changes brought on by containerization in the legislative history of the Act.

*cargo between ship and land transportation.*[9]

*Id.* at 423–24, 105 S.Ct. at 1427–28 (emphasis added; citations and footnote omitted).

The Court concluded that the claimant's work had nothing to do with the loading or unloading process.... He built and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment.... To hold that [he] was necessarily engaged in maritime employment because he was on a drilling platform would ignore Congress' admonition that not everyone on a covered situs automatically satisfies the status test.

*Id.* at 425, 105 S.Ct. at 1428 (footnote omitted).

Although Rock and the director would have us dismiss the *Herb's Welding* test as not controlling here, because the Supreme Court apparently precluded coverage based on the conclusion that the entire enterprise of offshore drilling was not "maritime," we believe that the outer limits stated in *Herb's Welding* are binding. The Court's determination was necessary to resolve whether the claimant was covered under the Act. Because the claimant's work had nothing to do with the unloading or loading of cargo, his injury fell outside the scope of coverage. *See Coloma v. Director, Office of Workers' Compensation Programs*, 897 F.2d 394, 398 (9th Cir.) (rejecting an argument that the *Herb's Welding* test is not binding), *cert. denied*, — U.S. ——, 111 S.Ct. 61, 112 L.Ed.2d 36 (1990).

Regardless of remaining questions about the binding nature of the language in *Herb's Welding*, the Court's decision in *Schwalb* seems to settle the Court's view of coverage for land-based employees. In *Schwalb*, the Court upheld coverage under

the Act for "janitorial" employees whose duties included cleaning spilled coal from loading equipment in order to prevent equipment malfunctions and for a third employee whose job it was to maintain and repair loading equipment. 493 U.S. at 43, 110 S.Ct. at 383. The Court concluded that, although it had not previously so held, it was "quite sure" that employees "who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act." *Id.* at 47, 110 S.Ct. at 385.

The Court stressed that coverage "is not limited to employees who are denominated 'longshoremen' or who physically handle the cargo," *id.*, but it stated that "[i]n the course of considerable litigation, including several cases in this Court, it has been clearly decided that, aside from the specified occupations [in section 902(3)], land-based activity occurring within the § 903 situs will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel."[10] 493 U.S. at 45, 110 S.Ct. at 384. With respect to one employee the Court indicated that: "[t]he determinative consideration is that the ship loading process could not continue unless the retarder that [the employee] worked on was operating properly. It is notable that the loading actually stopped while [the employee] made the repairs...." *Id.* at 48, 110 S.Ct. at 386. The test, then, is described as follows: "the maritime employment requirement as applied to land-based work other than longshoring and the other occupations named in § 902(3) is an occupational test focusing on loading and unloading. Those not involved in those functions do not have the benefit of the Act." *Schwalb*, 493 U.S. at 46, 110 S.Ct. at 385.

### C. *The Courts of Appeals*

We have addressed status coverage under the 1972 amendments in a number of cases. In *Dravo Corp. v. Banks*, 567 F.2d

**9.** This statement cannot be read to impose a "loading" requirement on the shipbuilding occupations included in section 902(3). As stated in *Schwalb*, in *Herb's Welding* the Court intended the loading and unloading requirement *to* apply to land-based work other than longshoring and the other occupations explicitly listed in section 902(3). *Schwalb*, 493 U.S. at 46, 110 S.Ct. at 385.

**10.** Because the status test adopted by the Supreme Court of Virginia in *Schwalb* conflicted with the tests adopted by several courts of appeals, the Court granted certiorari to resolve the conflict. *Schwalb*, 493 U.S. at 44–45, 110 S.Ct. at 384.

593, 594 (3d Cir.1977), we held that a shipbuilder's employee who performed various unskilled jobs relating to plant maintenance, such as spreading road salt on walkways and removing general debris, was not covered under the Act. We used an "integral part" or "necessary ingredient" test, and determined that the employee's duties were incident to, but not an ingredient of, ship-building:[11]

> [The employee's] duties have no traditional maritime characteristics, but rather are typical of the support services performed in any production entity, maritime or not.... Clearing ice is a 'necessary incident' of *any* operation. We suggest that in order to be covered, Bank's job should have been a necessary '*ingredient*' in the ship-building process, which it was not.

*Id.* at 595–96.

We drew a parallel to another case in which we excluded a clerical worker in a marine terminal office from Act coverage, *Maher Terminals, Inc. v. Farrell*, 548 F.2d 476 (3d Cir.1977).[12] In *Maher* we determined that a clerical worker "was not an employee 'handling cargo' as contemplated in *Sea–Land Service, Inc. v. Director, Office of Workers' Compensation Programs*, 540 F.2d 629 (3d Cir.1976)."[13] *Banks*, 567 F.2d at 595. Thus, we reasoned in *Banks* that "[j]ust as a clerical worker fell outside Congress' concern for employees who actually handled cargo, Banks cannot be viewed as coming within the statutory term 'shipbuilder.' He does not work on, or with, any of the component parts used in building ships." *Id.* at 596. In a more recent case, we held that the Act covered a "checker" involved in intermediate cargo transportation between the seaward side of the dock and the adjacent storage area from which customers picked up cargo. *Novelties Distribution Corp. v. Molee*, 710 F.2d 992, 996 (3d Cir.1983), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1014, 79 L.Ed.2d 244 (1984). *Molee* reaffirmed that " '[t]he key is the functional relationship of the employee's activity to maritime transportation, as distinguished from such land-based activities as trucking, railroading or warehousing.' " 710 F.2d at 996 (*quoting Sea–Land*, 540 F.2d at 638). We relied heavily on the Supreme Court's decisions in *Northeast* and *Ford*, which held that an employee responsible for a portion of cargo-transporting activity between a ship and land was as much an integral part of loading or unloading a ship as a person who participated in the entire process. *Molee*, 710 F.2d at 996.

The *Schwalb* "loading and unloading" test was applied in our most recent decision interpreting the Act. *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991). In *Peter*, we determined that the Act covered an employee working on ships and an adjacent pier, and thereby obviously satisfying the "situs" requirement of the Act, who connected hoses that were used to pump fuel aboard ships docked at a refinery.[14] *Id.* at 937. Our analysis was right to the point: "[a]s both the hose around [cleaning hoses] and connecting of fuel hoses were tasks *necessary to the loading of vessels*, Peter

---

**11.** The employee argued that he was covered because his job was "directly supportive of those involved in shipbuilding." *Banks*, 567 F.2d at 595.

**12.** In 1984, Congress expressly excluded clerical workers from coverage under the Act. 33 U.S.C. § 902(3)(A).

**13.** In *Sea–Land*, we were primarily concerned with whether coverage under the Act was foreclosed by the fact that the accident occurred on a public street not under the employer's control. 540 F.2d at 639. Because evidence bearing upon the specific function of the employee at the time of the accident was inadequate to determine whether he was engaged in maritime employment, we remanded for further fact finding. *Id.* at 640. (We note that this "time of the accident" approach has since been rejected by the Supreme Court in *Northeast*). We offered this guidance: "the overall intention appears to be to afford federal coverage to all those employees engaged in handling cargo after it has been delivered from another mode of transportation for the purpose of loading it aboard a vessel, and to all those employees engaged in discharging cargo from a vessel up to the time it has been delivered to where the next mode of transportation will pick it up." *Id.* at 638.

**14.** The fuel *was* the cargo. *Id.* at 937.

also satisfies the 'status' requirement." *Id.* at 938 (emphasis added) (omitting citations to *Schwalb, P.C. Pfeiffer,* and *Northeast* ).[15]

Although *Peter* is our only relevant case after *Herb's Welding* and *Schwalb,* our use of and citation to the *Schwalb* test does not mark a shift in understanding. All of our previously-noted cases indicate that we require some nexus between the employee's activities and either cargo-handling or ship-building, the primary functions of the major areas of occupation listed in section 902(3). The employees in those cases have either directly handled cargo or have been so far removed from the entire process of loading and unloading that they cannot provide a clear model for this case in which the employee provided the means of transportation for crewmembers who left the ship during the loading and unloading process. Arguably Rock's activity has some slight nexus with the loading process and his position is necessary to Sea–Land because of security concerns attendant upon the storage and inter-terminal transport of valuable cargo. A brief review of other courts of appeals decisions is thus essential and instructive in our resolution of this case. We are satisfied, however, that the sum of our holdings and others leads to the conclusion that Rock is not covered under the status provision of the Act.

In all but one of the courts of appeals cases cited in Rock's brief, other than those already discussed above, the covered claimant's activities actually had some close nexus to the loading or unloading of cargo. *See, e.g., Levins v. Benefits Review Board,* 724 F.2d 4 (1st Cir.1984) ("book clerk" often had duties similar to checker, including occasionally going to container yard and checking loading seal numbers against a list to see that containers were loaded in proper order); *Arbeeny v. McRoberts Protective Agency,* 642 F.2d 672 (2d Cir.) (security guard guarding unloaded cargo deemed an "integral part" of unloading process), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 116 (1981); *Miller v.*

*Central Dispatch, Inc.,* 673 F.2d 773 (5th Cir.1982) (security guard/courier guarding detainees aboard ship and transported cargo between vessels and shore held covered); *Kelly v. Director, Office of Workers' Compensation Programs,* 678 F.2d 830 (9th Cir.) (security guard protecting unloaded cargo from theft held covered), *cert. denied,* 459 U.S. 863, 103 S.Ct. 140, 74 L.Ed.2d 119 (1982); *Garvey Grain Co. v. Director, Office of Workers' Compensation Programs,* 639 F.2d 366 (7th Cir.1981) (maintenance employee repairing loading spout and bucket conveyers used to load barges and moving barge hatch covers to make barges available for loading held covered); *Prolerized New England Co. v. Benefits Review Board,* 637 F.2d 30 (1st Cir.1980) (maintenance employee occasionally operating integrated loading system which prolerized metal and facilitated its loading onto ships held covered; claimant also occasionally loaded the ship and repaired loading equipment when it broke down during the loading process), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981); *White v. Newport News Shipbuilding and Dry Dock Co.,* 633 F.2d 1070 (4th Cir.1980) (worker unloading and color-coding pipe used in ship-building performed "integral part" of ship-building process); *Walter Tantzen, Inc., v. Shaughnessy,* 624 F.2d 5 (2d Cir.1980) (salesman sampling, testing and inspecting cargo on pier after discharge from vessel and before delivery to consignee held covered); *Cargill, Inc. v. Powell,* 625 F.2d 330 (9th Cir. 1980) (employee unloading cargo from railroad cars and placing it in grain elevators prior to loading aboard ship considered covered; point of rest theory rejected); *Texports Stevedore Co. v. Winchester,* 554 F.2d 245 (5th Cir.), *as modified by* 561 F.2d 1213 (5th Cir.1977) (employee repairing and maintaining gear used in loading and unloading ships held covered), *aff'd on other grounds,* 632 F.2d 504 (5th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). *See also Graziano v. General Dynamics Corp.,* 663 F.2d 340, 344 (1st Cir.1981) ("Graziano occupies a

---

**15.** The question of Peters' coverage was a predicate one. The central issue in *Peter* was wheth-er the Act was Peter's exclusive source of relief. *Id.* at 937.

status covered by the Act because a regular portion of his overall employment entailed cleaning out acid tanks and steel mill boilers, work which is indisputably maintenance of shipbuilding equipment").

The board's reliance on the decisions in *White, Graziano, Miller,* and *Arbeeny* is thus misplaced, in that the claimants in those cases were closely tied to ship-building or cargo-loading. The employees in *White* and *Graziano* performed tasks with equipment directly used in the process of shipbuilding. The employee in *Miller* actually transported cargo and was often on board ships. The guard in *Arbeeny* was employed in guarding unloaded cargo, and his position has since been removed from coverage by the 1984 amendments to the Act. *See* 33 U.S.C. § 902(3)(A). These cases are easily distinguishable from the one before us. Although it is clear that a worker need not actually handle cargo to fulfill the status requirement, Rock's work was simply too remote from the chain of events directly leading to the loading of cargo.

The board in this case also relied on the opinion of the Court of Appeals for the Eleventh Circuit in *Sanders v. Alabama Dry Dock and Shipbuilding Co.,* 841 F.2d 1085 (11th Cir.1988), which upheld coverage of an employee who was wholly uninvolved in loading or shipbuilding, but this reliance was misplaced. In *Sanders,* a labor relations assistant was held to be covered under the Act. His duties included advising foremen of the content of union contract agreements, investigating, mediating, and processing grievances of union personnel, and boarding ships in order to inspect the workers' progress. *Id.* at 1086. He was expected to "get around" the shipyard and make his presence known to the workers. *Id.* The court held that he was covered, and in doing so, explained: "[w]hether particular job skills are uniquely maritime is not dispositive in determining whether the status test is satisfied, rather the proper focus should be upon whether the purposes served in applying the jobs skills directly relate to furthering the shipyard concerns of a covered employer." *Id.* at 1088.

Surely Rock would be covered under such an all-encompassing test; however, the Court of Appeals for the Eleventh Circuit rejected the *Sanders* expansive view in *Atlantic Container Service, Inc. v. Coleman,* after the Supreme Court decided *Schwalb.* 904 F.2d 611 (11th Cir.1990).[16] Thus in holding that the land-based work of a mechanic who maintained transportation equipment used in intermediate transport of outbound containers ·was an "integral part" of the loading or unloading of vessels, the court of appeals explicitly retreated from its earlier *Sanders* holding stating:

> [h]owever, as the latest pronouncement from the Supreme Court, the *Schwalb* test supersedes any differing standard previously used by this court, such as whether an employee's responsibilities have a 'significant relationship' to the maritime concerns of his employer.... The standards in ... *Sanders* approximate the 'significant relationship' test rejected by the Supreme Court in *Schwalb.*

*Id.* at 618 n. 5.

The opinion of the Court of Appeals for the Ninth Circuit in *Coloma v. Director, Office of Workers' Compensation Programs,* 897 F.2d 394 (9th Cir.1990), is both recent and helpful. There the claimant, Coloma, was a "messman/cook" working at the "Seagull Inn," Chevron's crew's mess on the longwharf. *Id.* at 395. The Seagull Inn provided meals for officers and seamen of visiting vessels, while shipboard stewards took shore leave. *Id.* The inn also served Chevron's ship crews and other visitors, such as Coast Guard and customs officials. *Id.* at 395–96. Chevron closed the inn in 1982 and transferred most of its employees to shipboard positions. *Id.* at 396. The board, affirmed by the Court of Appeals for the Ninth Circuit, denied benefits for certain dermatological conditions that Coloma developed from handling harsh cleansing chemicals used at the inn, finding that he did not fulfill the Act's status requirement.

**16.** It seems only appropriate to note that the board's decision and order relying on *Sanders* was issued before *Atlantic Container* was decided by the court of appeals.

The court determined that the board had properly applied the "essential elements of loading and unloading" test recognized in *Herb's Welding* and *Schwalb*. *Id.* at 400. The court noted that after the inn closed, Chevron's longshoring operations continued, and Coloma's duties were therefore not essential to the loading process and Chevron was not forced to shut down its operations. *Id.* The court distinguished the case from *Schwalb*, where the maintenance men would have halted the entire loading process if they had stopped clearing the loading equipment. *Id.*

Rock's occupation is similar in function and in importance to Coloma's. Both workers performed helpful services for visitors on their employer's property, but neither was indispensible to the loading process itself. If Sea–Land opened its terminal to private vehicles and discontinued Rock's position, as Chevron discontinued Coloma's, the loading process would continue. Sea–Land would simply require more security guards on the premises. The path of cargo from storage to ship would be completely unaffected by the termination of Rock's position. We find *Coloma's* reasoning persuasive, especially in light of the more recent holdings of the Supreme Court.

■ We conclude that we must follow the test provided by the Supreme Court in *Schwalb*. Land-based activity occurring within the section 903 situs, other than those activities explicitly listed in section 902(3), should be deemed maritime only if it is an integral or essential part of the chain of events leading up to the loading, unloading, or building of a vessel.

■ We reject Rock's claim that we should affirm the board because his duties of transportation were absolutely necessary and integral to Sea–Land's cargo-handling business. The importance of Rock's position, in the absence of a nexus with the loading or unloading process, does not mandate coverage under the Act. The Supreme Court in *Herb's Welding* indicated: "[s]ince it is doubtful that an offshore driller will pay and maintain a worker on an offshore rig whose job is unnecessary to the venture, this approach would extend coverage to virtually everyone on the stationary platform. We think this construction of the Act is untenable." 470 U.S. at 1426, 105 S.Ct. at 1426. The same logic applies to this case.

The fact that Rock might have occasionally transported longshoremen does not alter our conclusion. Rock's job description did not include such services, and separate buses existed to transport the longshoremen. We cannot provide coverage for such infrequent activity undertaken by the employee.[17]

## IV. Conclusion

We will not reach beyond the scope of coverage circumscribed by the Supreme Court in *Schwalb*. Because Rock's occupation was not an essential element or ingredient of the loading or unloading process, Rock was not engaged in "maritime employment" under section 902(3). We will therefore grant the petition for review and will set aside the decision and order of the Benefits Review Board of January 25, 1991.

---

**17.** Although the director notes that Rock was officially subject to reassignment to longshoring positions and argues that under *Northeast,* this fact entitles Rock to coverage, the director has misinterpreted *Northeast*. The Court in *Northeast* sought to prevent the hazards of shifting coverage by covering employees who at one moment might be involved in loading but at another moment might be finishing that job and starting another that would not be traditionally covered. The Court was following the clear intent of the statute, which was in part to avoid the shifting coverage caused by an employee's constant movement during the workday between sea and land. The *Northeast* holding cannot be stretched to cover Rock, who voluntarily chose a position that would no longer involve him in the dangers of loading and unloading, and whose only occupation in the two years in which he held his new job was to drive the courtesy van. *Northeast* protects those employees who walk in and out of coverage on a frequent basis, not those who are nominally subject to reassignment.